*Steven Hicks v. State of Maryland*, No. 634, September Term, 2024.  Opinion by Graeff, J.

**FOURTH AMENDMENT — REASONABLE SUSPICION — *TERRY* STOP — SECOND AMENDMENT — *TERRY* FRISK**

In *New York State Rifle and Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022), the United States Supreme Court substantially changed the legal landscape with its holding that the Second and Fourteenth Amendments to the United States Constitution protect an individual's right to carry a handgun for self-defense outside the home. This ruling, among other things, changes the analysis for whether possession of a gun justifies an investigatory stop under the Fourth Amendment. Although the Maryland appellate courts have, for decades, upheld police stops based on reasonable suspicion that a person is in possession of a gun, after *Bruen,* carrying a handgun publicly for self-defense is presumptively lawful, and therefore, mere possession of a concealed firearm, by itself, is not indicative of criminal activity. The mere possibility that a person with a gun might not have a valid license or otherwise may be restricted from possessing a gun is not enough to establish reasonable suspicion for a seizure. The police must have reasonable suspicion that the person is possessing the gun illegally or otherwise engaged in criminal activity. Because the officers here stopped appellant based solely on his possession of a gun, without reasonable suspicion that he was possessing the gun illegally or otherwise involved in criminal activity, they did not have reasonable suspicion to stop him.

We reject appellant's claim that, after *Bruen*, an officer may not conduct a *Terry* frisk for officer safety when a suspect lawfully stopped is armed. Because a gun is a dangerous weapon, officers may frisk a suspect carrying a gun regardless of whether the suspect is carrying the gun legally or illegally. There is no dispute here that appellant was armed with a handgun. Had there been a proper stop, the police had reasonable suspicion to frisk appellant.

The police also exceeded the scope of a *Terry* frisk by reaching into appellant's bag and pockets. A *Terry* frisk is limited to a pat-down of outer clothing unless the police show that a pat-down would be insufficient to determine whether a suspect was armed and dangerous. The State did not make that showing here. Moreover, the State failed to meet its burden of proving that the plain view and plain feel doctrines applied to justify the seizure of the drugs and gun. The officer who conducted the pat-down and found the second gun and drugs did not testify, and there was no evidence regarding what that officer observed in the bag prior to reaching inside. There also was no testimony that, based on what the officer felt during the pat-down, it was immediately apparent to him that appellant's pocket contained contraband.

The stop and frisk here were unconstitutional. The court erred in denying the motion to suppress.

Circuit Court for Baltimore City
Case No. 123209008

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 634

September Term, 2024

_____

IN BANC

_____

STEVEN HICKS

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Graeff,
Berger,
Nazarian,
Arthur,
Leahy,
Reed,
Friedman,
Shaw,
Zic,
Ripken,
Tang,
Albright,
Kehoe, S.,

JJ.

_____

Opinion by Graeff, J.
Joint Concurring Opinion by Berger, Friedman,
and Shaw, JJ.
Concurring Opinion by Nazarian, J.
Concurring Opinion by Leahy, J.
Concurring Opinion by Friedman, J.

_____

Filed: June 4, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Steven Hicks, appellant, was indicted in the Circuit Court for Baltimore City with multiple drug and firearm offenses. He filed a motion to suppress the two handguns and cocaine discovered during a warrantless search of his person and bag.  He argued, among other things, that the officers did not have either probable cause or reasonable suspicion to stop or frisk him because he had a permit to carry the weapons at issue.  After the court denied the motion, appellant then entered a conditional guilty plea to possession of a firearm with a nexus to a drug trafficking crime.  The court sentenced him to five years of incarceration without the possibility of parole.

On appeal, appellant presents two questions for this Court's review,[1] which we have consolidated and rephrased, as follows:

> Did the circuit court err in denying appellant's motion to suppress evidence recovered during a warrantless search of his person and cross-body bag?

For the reasons set forth below, we shall reverse the judgment of the circuit court.

---

[1] Appellant presented the following questions for review:

1.  In light of *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), may police arrest or conduct a *Terry* stop or pat-down of an individual based solely on his carrying a holstered handgun where he immediately asserts that he had a license to carry the gun without first allowing him to produce the license?

2.  Assuming, *arguendo*, that this Court determines that [appellant] was not arrested and that a *Terry* stop and frisk were warranted, (a) did the police exceed the scope of the pat-down search by putting their hands in [appellant's] pockets and his cross-body bag; and (b) did the State present evidence to justify the search of [appellant's] pocket and bag without calling the officers who removed the evidence to testify at the suppression hearing?

## FACTUAL AND PROCEDURAL BACKGROUND

On July 5, 2023, Detective Mitchell Ramsey, a member of the group violence unit ("GVU") of the Baltimore City Police Department, was a passenger in an unmarked vehicle driven by Detective Alex Rodriguez. As the officers approached the intersection of St. Charles and Belvedere, Detective Ramsey observed a large group of individuals congregating. When appellant saw the unmarked vehicle, he turned and began walking away from the group. Appellant had a satchel positioned across the front portion of his body. While appellant was walking, Detective Ramsey saw the rear handle of a handgun in the front right side of appellant's waistband. The handgun was "physically printing through the shirt," meaning that Detective Ramsey could "see the angular shape, the back portion of an LL line of the rear handle of the handgun" through appellant's t-shirt.

Detective Ramsey activated his body worn camera, exited his vehicle, and told appellant to put his hands up. Appellant asked "for what," then immediately stated that he had a license. Detective Ramsey told appellant that he was stopping him because he observed a firearm physically printing in appellant's waistband, and he placed appellant in handcuffs. Appellant reiterated that he had a permit for the gun, and asked if he could "pull out" his license. Detective Ramsey explained that he "had an investigation to conduct." The handgun was located in a holster inside of appellant's waistband. Detective Ramsey alerted surrounding officers that there was a gun in appellant's waistband. Another officer, Detective Rodriguez, removed the gun and handed it to Detective Ramsey, who rendered it safe by ejecting the magazine and racking the slide of the weapon.

2

At the suppression hearing, Detective Ramsey testified that he then stepped away from appellant while other officers conducted "a continued weapons pat down of [appellant's] person." During the pat down, officers recovered a second firearm from the satchel and CDS from appellant's left pants pocket. Detective Ramsey observed the CDS recovered and described them as "[s]mall trash cans . . . multicolored trash cans commonly utilized to package and hold street level cocaine within Baltimore City."

After discovering the CDS, Detective Ramsey gave appellant his *Miranda* warnings. He asked him where his license was located, and appellant replied: "Bro, it's right here in my thing. I was going to get it."

Detective Rodriguez did not testify at the suppression hearing. Instead, the State introduced Detective Rodriguez's body camera footage into evidence and played it for the court. The video shows Detective Rodriguez approaching appellant as Detective Ramsey detained him and another officer handcuffed him. Appellant asked why they stopped him and repeatedly stated that he was licensed. Detective Ramsey explained that he stopped appellant because he saw a firearm in his waistband, and even though appellant said that he had a license, the police still had to do an investigation. The video shows Detective Rodriguez removing the firearm, which was located in a holster, from the right side of appellant's waistband. Detective Rodriguez put his hand slightly into the satchel, pulled away the unzipped back pocket, felt the outside of the satchel, and stated that "there's a second firearm inside the bag." Detective Rodriguez removed the satchel and handed it to Officer David Burch, instructing him to "zip it up, zip it up." Officer Burch opened the main compartment of the satchel and looked through it, then handed it to another officer.

3

Detective Rodriguez introduced himself, explained that appellant was being recorded, and reiterated that the officers stopped appellant because they observed his firearm printed on his front waistband.[2] While holding onto appellant's waist and briefly patting down appellant's outside right pocket, Detective Rodriguez asked appellant if there was anything on him that he should know about. Appellant's response was unintelligible. Detective Rodriguez briefly felt the outside of appellant's left pocket and then started to pull out a plastic baggy from inside appellant's pocket. He stated that he needed gloves and then pulled open the pocket to look at the contents again. Detective Ramsey then read appellant his *Miranda* rights.

Approximately five minutes later, Detective Rodriguez put on gloves and removed from appellant's pockets the plastic baggies, as well as numerous small plastic containers. He then searched appellant's entire satchel. The video shows Officer Burch transferring small plastic containers from the satchel into an evidence bag.[3]

On cross-examination, Detective Ramsey testified that the officers were in the neighborhood for an investigation unrelated to appellant. They observed appellant "blade his body" and cross directly behind their unmarked vehicle.[4] Appellant did not take off

---

[2] Appellant told the officers that he had been stopped by a sergeant a week earlier, showed his permit, and was allowed to leave.

[3] Appellant continued to question the officer's actions stating: "Guns are legal. Aren't they all supposed to be 'where's your ID?' Ya'll all grabbing me, going into my pockets, don't move, and all this, like, come on."

[4] In a situation where an officer testifies that blading by a suspect was suspicious, it can be a factor in the reasonable suspicion analysis. *See Booker v. State*, 267 Md. App.

4

running when Detective Ramsey told him to stop and put his hands up. Appellant did not put his hands up, however, and his one hand was in close proximity to where Detective Ramsey observed the firearm.

Detective Ramsey was aware that people have concealed carry permits in Maryland. The gun was under appellant's shirt, in a holster, and not in view. Another gun was discovered in appellant's satchel by a different officer.

When stopped, appellant immediately told Detective Ramsey that he had a license. Detective Ramsey "put [appellant's] hands behind his back." Appellant reiterated that he had a license three times as he was handcuffed and surrounded by four officers. As the body cam video played, Detective Ramsey identified the officers present at the scene. He testified that Detective Rodriguez reached into appellant's satchel with his right hand. Appellant again asked if he could get his license, but none of the officers responded to his request.[5]

---

315, 320 (2025) (officer discussed the suspect blading, which he explained as "when a person will position their body or move their body in a certain way, or the way they are sitting or standing, or just by covering up an object with a hand" "to conceal an object from police view," as a factor in stopping appellant). Here, Detective Ramsey did not even mention blading in his direct examination as a reason he stopped appellant, and he never testified regarding what that was or that this was a factor in the decision to stop appellant. Detective Ramsey's testimony was that the stop was based on the sighting of the gun, and the State argued below and on appeal that the stop was reasonable on that ground alone. The issue presented to us by the parties is whether, after *Bruen*, the possession of a firearm, by itself, constitutes reasonable suspicion to conduct an investigatory stop, and that is the issue we address.

[5] Detective Ramsey was not sure where appellant's license ultimately was located, but, based on the video, it appears that the permit was recovered from appellant's satchel after Detective Rodriguez removed the satchel during the frisk.

5

Detective Ramsey testified that Detective Rodriguez conducted an initial pat down of appellant prior to reaching in his pockets and discovering a bag of cocaine. Defense counsel introduced for identification appellant's firearm permit, which indicated an expiration date of February 28, 2026, with no restrictions. The State stipulated that it was the permit discovered that day.

In argument, the State relied on *State v. Sizer*, 230 Md. App. 640, 651 (2016), *aff'd on other grounds*, 456 Md. 350 (2017), to support its position that "there was a reasonable articulable suspicion of an armed person" when appellant was detained, and there was "a reason for the pat down [leading] to the recovery of the first gun." It argued that the pat down led to the discovery of the second gun in the satchel, and the continued pat down after removal of the satchel led to the discovery of CDS. The State asserted that the officers acted reasonably under the totality of the circumstances in handcuffing appellant before conducting a *Terry* frisk because appellant's hand was inches from his gun, and the officer's needed "to get control of the situation" before verifying the permit.

Appellant's counsel began by stating that appellant was in full compliance with Maryland's permitting statute when the officers detained him, and the initial question was whether the circumstances were enough to justify the stop. He argued that, if the court ruled it was enough to justify a frisk after the decision in *New York State Rifle and Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), an officer must show that a person is armed *and* dangerous, and "armed does not automatically mean dangerous." Counsel argued that appellant was not dangerous because when appellant was ordered to stop, he immediately did so, faced the officers, did not reach for anything, and stated several times that he had a

6

license. He argued that it was incumbent on the officers to verify the license at that point, but instead, Detective Rodriguez removed appellant's weapon and started "digging in th[e] satchel."

Counsel asserted that, under *McDowell v. State*, 407 Md. 327 (2009), Detective Rodriguez was not authorized to pull out the bag of cocaine in appellant's pockets because he knew it was not a weapon. He argued that the search was not reasonable, and "at the very least, the cocaine should be suppressed." He also noted that Detective Rodriguez was not called by the State to testify regarding his discovery of the cocaine based on the plain feel doctrine.[6]

In reply, the State noted that only one minute and 40 seconds passed between the time Detective Rodriguez exited from his vehicle and the time he felt the drugs in appellant's pocket. During that 100 seconds, the officers "had not had the opportunity or the time to verify a permit" because they needed to get control of the situation. The State did not agree that Detective Rodriguez reached into the bag, and, in any event, it argued that "there would have been inevitable discovery once [appellant] was placed under arrest for the drugs." It asserted that the officers acted reasonably. The State compared stopping an individual with a suspected concealed weapon to stopping individuals driving cars with a barely legal window tint, noting that, "[e]ven if they are actually in compliance, there's still a reasonableness to investigate."

---

[6] The prosecutor stated that it did not call Detective Rodriguez to testify because it believed appellant's argument would be limited to the permit issue.

The court denied appellant's motion to suppress, finding that the "officers acted reasonably to protect themselves and to protect the public." It stated that

> you can have 453,000 handgun permits valid, legal; If you walk around the streets of the United States, not just Maryland, well I can't say United States, cause you can do it probably in Texas, but if [you] walk around the streets of Maryland, Baltimore City with a handgun, a weapon which was clearly obvious to me when I first saw you, that that's what was under that T-shirt, you're gonna get stopped. That is just the nature of the beast. You can have all the permits you want, sir. When a police officer sees that you have a gun, you could've been a police officer. It would not matter if they did not know you. They would have been well within their means to stop you.

Noting that a person could lie about having a permit, or even if the person had a permit, use the gun to shoot the police or members of the public, the court found that the officers "were well within their right to stop [appellant] for their safety as well as the safety of the community at large."

With regard to the second handgun recovered, the court found that the back zipper of the satchel was open when Detective Rodriguez removed the first gun from appellant's waistband. The court stated: "He stuck his hand in their [sic]. I don't know what he might find. I don't know, maybe ammunition, who knows? But something he saw in there, he put his hand in, and then he immediately took his hand out, waited and said . . . 'We got a firearm inside the bag.'" The court reiterated that the officers would be neglecting their duties, their own safety, and the safety of the community, if they believed everyone who claimed they had a license without verification, and explained that:

> No reasonable police officer is gonna allow you to go in your pocket and try to find your license or go in that bag and try to find your license where there could be another weapon. It doesn't work like that, sir, that's not how officers are trained and that's not what they should do.

8

The court found that the search of appellant's pants pocket was reasonable as a frisk to protect the police and the community.

As indicated, after the court denied the motion to suppress, appellant entered a conditional guilty plea to possession of a firearm with a nexus to a drug trafficking crime. The court sentenced him to five years of incarceration without the possibility of parole.

This appeal followed.[7] The parties briefed the issues they were presenting to the Court, and argument ensued before a three-judge panel on February 6, 2026. A majority of this Court subsequently voted to hear the case in banc,[8] and the Court held an in banc hearing on March 31, 2026.

**STANDARD OF REVIEW**

The standard of review for a motion to suppress is well established:

> When reviewing a circuit court's denial of a motion to suppress evidence, we are "limited to the record developed at the suppression hearing." *Moats v. State*, 455 Md. 682, 694, 168 A.3d 952 (2017). "We review the evidence and the inferences drawn therefrom in the light most favorable to the prevailing party." *Thornton v. State*, 465 Md. 122, 139, 214 A.3d 34 (2019). As a "mixed question of law and fact[,]" we accept "the hearing court's finding[s] of fact unless they are clearly erroneous" but "review the hearing judge's legal conclusions *de novo*[.]" *Id.* (citations omitted). Thus, we independently evaluate without deference to the circuit court whether a police officer's conduct violated the constitutional rights of the defendant. *Sizer v. State*, 465 Md. 350, 362, 174 A.3d 326 (2017).

---

[7] Pursuant to the plea agreement, the State agreed to appellant's release from incarceration pending appeal.

[8] Md. Code Ann., Cts. & Jud. Proc. ("CJ"), § 1-403(c) (2025 Supp.) provides that "[a] hearing or rehearing before the court in banc may be ordered in any case by a majority of the incumbent judges of the court."

*State v. Smith*, 265 Md. App. 91, 101, *cert. denied,* 491 Md. 639 (2025) (quoting *Brown v. State*, 261 Md. App. 83, 93 (2024)).  *Accord State v. Stone*, 493 Md. 78, 96 (2026).

## DISCUSSION

Appellant contends that the court erred in denying his motion to suppress.  He makes several arguments in support of this contention. First, he argues that the stop was unconstitutional in light of *Bruen*, asserting that (a) the "encounter was an arrest unsupported by probable cause" because post-*Bruen* "knowledge that someone is carrying a gun cannot generate probable cause that they are doing so illegally"; and (b) even if the encounter constituted a *Terry* stop, in light of *Bruen* the police did not have reasonable suspicion to detain him.  Second, appellant argues that, even if the stop was lawful, the frisk was not justified because the police lacked reasonable suspicion that he was dangerous.  Finally, appellant argues that, even if the stop and frisk were warranted, Detective Rodriguez "exceeded the permissible scope of a *Terry* frisk for weapons by immediately putting [his] hands into [appellant's] bag and pockets."  He asserts that the State failed to present evidence to justify this search under the plain sight and plain feel doctrines because Detective Rodriguez did not testify.

The State contends that the court correctly denied appellant's motion to suppress. It argues that the appellant's encounter "amounted only to an investigatory detention," not an arrest, and the stop was supported by reasonable suspicion that appellant carried a handgun unlawfully.  The State asserts that *Bruen* does not alter the "foundational premise that, by statute in Maryland" the carrying of a handgun is "presumptively unlawful," with certain exceptions, including possessing a permit, and therefore, an officer may detain an

10

individual with a handgun to determine if the individual possesses a valid permit. With respect to the frisk, the State argues that "a reasonable suspicion that a person is armed is per se a reasonable suspicion that the person is dangerous, warranting a frisk for weapons." Regarding the scope of the frisk, the State contends that appellant did not preserve for review his claim that the frisk exceeded its proper scope, and in any event, Detective Rodriguez lawfully seized the handgun and cocaine under the plain sight and plain feel doctrines.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. CONST. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Richardson v. State*, 481 Md. 423, 445 (2022) (quoting *Riley v. California*, 573 U.S. 373, 381-82 (2014)). "Whether a particular warrantless action on the part of the police is reasonable under the Fourth Amendment depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Trott v. State*, 473 Md. 245, 255 (2021) (quoting *Pacheco v. State*, 465 Md. 311, 321 (2019)).

As indicated, appellant presents several arguments in support of his contention that the encounter here was not reasonable under the Fourth Amendment. Because appellant relies heavily on the decision in *Bruen* in support of these arguments, we will briefly discuss that case, and Maryland's response to it to date, before addressing appellant's specific contentions.

11

# I.

## Legal Background

In *Bruen,* 597 U.S. at 10, the United States Supreme Court issued a ruling that substantially changed the legal landscape. It held that the Second and Fourteenth Amendments to the United States Constitution "protect an individual's right to carry a handgun for self-defense outside the home." The case arose from a challenge to the constitutionality of New York's licensing regime, which made it a crime to possess any firearm without a license, and provided that, to obtain a license to carry a concealed gun, the applicant must show "proper cause." *Id.* at 11. The "proper cause" requirement had been interpreted to require an applicant to "demonstrate a special need for self-protection distinguishable from that of the community." *Id.* at 12.

The Court stated that, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 24. The Court held that the plain text of the Second Amendment, which provides that "the right of the people to keep and bear Arms, shall not be infringed," protects an individual's right to carry handguns publicly for self-defense. *Id.* at 32-33. Based on that plain language, the government had the burden to justify any regulation on handguns by showing that it was "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 33-34. The Court acknowledged that "the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 38. It concluded, however, that the "historical record compiled by

respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" or "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* at 38. Accordingly, the Court held that New York's proper cause licensing requirement was unconstitutional. *Id.*

Prior to *Bruen*, states with permitting schemes were either "shall issue" or "may issue" regimes. *Fooks v. State*, 490 Md. 458, 479 (2025), *cert denied*, 2026 WL 490722 (2026). *Accord Bruen*, 597 U.S. at 13-14. Shall-issue regimes, 43 states in 2022, required authorities to issue concealed-carry licenses if applicants satisfied certain threshold requirements. *Bruen*, 597 U.S. at 13. They did not "require applicants to show an atypical need for armed self-defense" and did not "necessarily prevent 'law-abiding, responsible citizens'" from obtaining a permit for public carry. *Id.* at 13, 38 n.9. Rather, they imposed "narrow, objective, and definite standards," such as background checks and firearm safety courses, to confirm that licensees were, in fact, law-abiding. *Id.* at 38 n.9 (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)). "May issue" regimes, by contrast, which included six states in 2022, including Maryland and New York, required a special showing of need to obtain a permit to carry a firearm in public and gave authorities "discretion to deny concealed-carry licenses even when the applicant satisfies the statutory

criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." *Id*. at 13-14.[9]

Prior to *Bruen*, Maryland's "may-issue" licensing regime required applicants for a permit to carry a handgun to show that they had "good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit [was] necessary as a reasonable precaution against apprehended danger." *In re Rounds*, 255 Md. App. 205, 210 (2022) (quoting Md. Ann. Code, Pub. Safety ("PS") § 5-306(a)(6)(ii)). Maryland courts had interpreted this requirement to mean that an applicant "must demonstrate having received actual threats or assaults" to qualify for a permit. *Id.* at 210-11. After *Bruen*, this Court held that the "good and substantial reason" requirement of PS § 5-306(a)(6)(ii) was unconstitutional. *Id.* at 212.

In 2023, the General Assembly amended PS § 5-306 to remove the "good and substantial reason" requirement, effective October 1, 2023. 2023 Md. Laws Ch. 651.[10] Maryland is now a "shall issue" state, and its citizens are authorized to obtain a concealed carry permit provided that they are 21 years of age or a member of the uniformed services, do not have any disqualifying offenses or mental disorders, do not have a substance abuse disorder, have successfully completed a firearms training course, and "based on an

---

[9] One state, Vermont, had no permit requirement for the concealed carry of guns. *Bruen*, 597 U.S. at 13 n.1. As discussed, *infra*, since *Bruen* was decided, other states now have no permit requirement for concealed carrying of guns.

[10] As indicated, the seizure here took place on July 5, 2023, after *Bruen*, but prior to the effective date of the new licensing scheme. Neither party argues that fact is significant to the resolution of this appeal.

investigation . . . ha[ve] not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another." PS § 5-306(a). Applicants must also show that they are "not otherwise prohibited by State or federal law from purchasing or possessing a handgun." *Id.* § 5-306(a)(10)(ii).[11]

With this background in mind, we now turn to the issues presented on appeal.[12]

## II.

## Initial Encounter

Appellant first challenges the initial encounter. There are three categories of police-citizen encounters: an arrest, an investigatory stop, and a consensual encounter. *Trott*, 473 Md. at 255. An officer is free to ask questions to persons on the street in a consensual encounter without any suspicion of criminal activity, but in that situation, the person has a "right to ignore the police and go about his business." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *see also Terry*, 392 U.S. at 34 (White, J., concurring).

---

[11] In *Bruen*, Justice Kavanaugh stated in his concurring opinion that "[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 597 U.S. at 81 (Kavanaugh, J., concurring) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008)). "Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.*

[12] Appellant did not challenge the constitutionality of Maryland's statute in his initial brief. Although he stated in a footnote in his reply brief that he was adopting arguments in other cases pending before the Court that the statute was unconstitutional, we will not address this argument. *See Gazunis v. Foster*, 400 Md. 541, 554 (2007) (we generally do not consider issues raised for the first time in a reply brief).

Here, the encounter between appellee and the police was not consensual; there is no dispute that appellant was seized when the police stopped him and placed him in handcuffs. *See Florida v. Bostick*, 501 U.S. 429, 439 (1991) (A "seizure" of a person under the Fourth Amendment occurs when police conduct communicates "to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."); *Terry*, 392 U.S. at 16 (a seizure occurs when a police officer accosts an individual and restrains that person's freedom to walk away); *Norman v. State*, 452 Md. 373, 386-87 (a seizure is "any nonconsensual detention"), *cert denied*, 583 U.S. 829 (2017).

The initial dispute here involves the type of seizure involved and whether it was justified by the requisite level of suspicion. There are two types of seizures that implicate the Fourth Amendment: (1) an arrest, which must be supported by probable cause; and (2) an investigatory stop, or a *Terry* stop, named after the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968), which must be supported by reasonable suspicion. *Norman*, 452 Md. at 387. *Accord Kopp v. State*, No. 34, Sept. Term, 2025, 2026 WL 1469044, at *6 (Md. May 26, 2026); *Trott*, 473 Md. at 255-56.

We need not determine here whether the initial encounter constituted an arrest requiring probable cause. As we shall explain below, we agree with appellant that, even if the initial encounter was an investigatory stop, a lesser intrusion, it was unconstitutional because the police did not have reasonable suspicion to stop appellant.

## A.

## Reasonable Suspicion Standard

Pursuant to *Terry*, 392 U.S. at 22, a law enforcement officer may stop an individual if the officer has reasonable suspicion that the person is involved in criminal activity. *Accord Wardlow*, 528 U.S. at 123 ("[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."). "Generally, an officer has reasonable suspicion to conduct a stop when there is 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Trott*, 473 Md. at 256 (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). The Supreme Court of Maryland has explained the standard, as follows:

> [R]easonable suspicion is a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act. While the level of required suspicion is less than that required by the probable cause standard, reasonable suspicion nevertheless embraces something more than an inchoate and unparticularized suspicion or hunch.

*Sellman v. State*, 449 Md. 526, 543 (2016) (quoting *Crosby v. State*, 408 Md. 490, 507 (2009)).

The reasonable suspicion standard "does not deal with hard certainties, but with probabilities." *United States v. Cortez*, 449 U.S. 411, 418 (1981). There are circumstances where "wholly lawful conduct might justify the suspicion that criminal activity was afoot." *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam). *Accord United States v. Rodriguez*, 739 F.3d 481, 486 (10th Cir. 2013). An officer may not, however, merely assert

that innocent conduct was suspicious. *See State v. Stone*, 493 Md. at 110. Rather, he or she "must explain how the observed conduct, when viewed in the context of all of the other circumstances known to the officer, was indicative of criminal activity." *Id.* (quoting *Crosby*, 408 Md. at 508). *Accord Holt v. State*, 435 Md. 443, 459 (2013) (officer must have reasonable suspicion "that a particular person has committed, is committing, or is about to commit a crime" to conduct an investigatory stop). An investigatory stop may last only as long as necessary to confirm or dispel an officer's suspicions. *Elliott v. State*, 417 Md. 413, 429 n.3 (2010).

**B.**

**Evidence to Suspect Criminal Activity**

Before addressing reasonable suspicion in the context of gun possession, we address three cases issued by the Supreme Court of Maryland that analyzed whether the police had reasonable suspicion to stop a person based on conduct or circumstances that could be criminal in some circumstances, but not criminal in other circumstances. The first case is *State v. Williams,* 401 Md. 676 (2007), where the Supreme Court of Maryland considered whether the police properly stopped a vehicle based on suspicion that the tinting of the vehicle's rear window was in violation of the statutory requirement that post-manufacture window tinting permit light transmittance of at least 35%. The officer testified that he stopped the vehicle because the window was darker than normal. *Id.* at 680. The Court held that this evidence was insufficient to give the officer reasonable suspicion to stop the vehicle because the law permitted tinting that blocked 65% of the light, and the officer did not have reasonable suspicion that the window was not in compliance with the statutory

18

requirement. *Id*. at 691-92. The Court rejected the State's argument that *any* tinted window could justify a stop, stating that this "would effectively strip away Fourth Amendment protection for any person driving or owning a car with tinted windows." *Id.* at 692. To justify a stop for a tinting violation based on an officer's observation, the officer must credibly articulate why the officer believed the tinting was illegal. *Id. See also Turkes v. State*, 199 Md. App 96, 116 (2011) (stop lawful based on officer's belief that tinting was in excess of the permissible tint level).

In the second case, *In re D.D.*, 479 Md. 206, 216-17 (2022), the Court addressed whether the odor of marijuana, by itself, provided reasonable suspicion justifying an investigatory detention. *Id.* at 216. Although prior cases had held that it did, *see e.g. Norman v. State*, 452 Md. 373, 409 (2017), in *D.D.* the Court was required to address, similar to this case, the impact of a change in the law on the reasonable suspicion analysis. *In re D.D.*, 479 Md. at 215. Prior to 2014, marijuana possession in any amount was illegal. *Id.* at 224. In 2014, the General Assembly decriminalized possession of less than 10 grams of marijuana. *Id.* at 215. Possession of less than 10 grams of marijuana remained a civil offense, however, punishable by fines and other remedies, and therefore, it was still illegal. *Id*.

In addressing the issue, the Court began by noting that it held in *Lewis v. State,* 470 Md. 1, 27 (2020), that the odor of marijuana on a person, by itself, did not provide probable cause to believe that the person was in possession of a criminal amount of the drug to authorize an arrest of the person. *In re D.D.*, 479 Md. at 215. In declining to extend its holding in *Lewis* to *Terry* stops, the Court noted that the encounter with D.D. was different,

19

and "the limited nature of a brief investigative stop does not demand a standard as stringent as probable cause." *Id.* at 230 (quoting *Crosby*, 408 Md. at 506). Although the odor of marijuana does not reveal the quantity of marijuana potentially held by a person, and therefore, it did not give the police probable cause to arrest, the odor was not irrelevant because it provided evidence of a crime. *Id.* at 234-35. The Court recognized that there could be innocent reasons that a person smelled of marijuana, but it noted that innocent conduct can amount to reasonable suspicion. *Id.* at 235. It held that, "although the quantum of evidence that the odor of marijuana provides is insufficient to justify an arrest based on the probable cause standard, it meets the reasonable suspicion standard necessary to justify a brief investigatory detention." *Id.*

In reaching its decision that the odor of marijuana gave the police reasonable suspicion to stop a person, the Court stated that it declined to "significantly hamper the legitimate investigation of criminal activity in Maryland." *Id.* at 238. It stated that "law enforcement officers do not need to rule out innocent explanations for suspicious conduct before conducting a *Terry* stop," and "[g]iven the important governmental interest in detecting, preventing, and prosecuting crime, the Fourth Amendment allows a brief seizure, based on reasonable suspicion, to attempt to determine whether criminal activity is afoot." *Id.*

The Court acknowledged that, in some instances, an individual may be stopped based on non-criminal behavior, stating:

> When a police officer smells marijuana on someone, it is certainly the case that the person may possess less than 10 grams of marijuana or they may possess no marijuana at all. But it also is possible that the person is presently

20

in possession of 10 or more grams of marijuana. Under [the defendant's] reasoning, police officers would be powerless to conduct a brief investigatory detention to try to determine which category the person is in. That is not what the Fourth Amendment requires. To the contrary, the odor of marijuana permits an officer to briefly detain an individual to investigate whether that person has committed a criminal offense.

*Id.*[13]

In the third case, *Stone*, 493 Md. at 130, the Supreme Court of Maryland, in a 4-3 decision, held that its "holding in *D.D.* and discussion of the reasonable suspicion standard was tied to the unique situation posed by the odor of marijuana." In *Stone*, the Court addressed whether an officer's observation of the defendant manipulating a mobile phone while his vehicle was in motion constituted reasonable suspicion for an investigatory stop. *Id.* at 96. In holding that it did not, the Court noted that it is illegal, while operating a motor vehicle, to use a device for certain purposes, such as texting, but it is permissible to use a

---

[13] In 2022, after the decision in *In re D.D.*, 479 Md. 206 (2022), Maryland voters approved a constitutional amendment permitting the use and possession of cannabis by an individual 21 years of age or older. *See Kelly v. State*, 262 Md. App. 295, 305 (2024). That same year, the General Assembly enacted legislation legalizing the use and possession of a "personal use amount" of cannabis. Md. Code Ann., Crim. Law ("CR") §§ 5-601, 5-101 (2025 Supp.). The General Assembly then enacted section 1-211 of the Criminal Procedure Article, which prohibits law enforcement from stopping or searching a person based solely on the odor of marijuana. Md. Code Ann., Crim. Proc. ("CP") § 1-211 (2025 Repl. Vol.). The legislature's decision to prohibit by statute stops based solely on the odor of marijuana may have "effectively overruled" or "superseded" the decision in *D.D.*, *see State v. Stone*, 493 Md. 78, 133(2026); *Cutchember v. State*, 493 Md. 187, 195 (2026). As the dissent in *Stone* noted, however, the General Assembly does not have the authority to overrule the "Court's decisions on constitutional matters," and the legislature's policy decision to prohibit by statute investigatory stops based solely on the odor of marijuana does not have any effect on the Fourth Amendment analysis. *Id.* at *33 (Gould, J., dissenting). *Accord York v. City of Burlington*, 225 F. Supp. 3d 341, 347 (M.D.N.C. 2016) (rejecting argument that arrest in violation of state law necessarily implicated violation of Fourth Amendment rights).

device for other purposes, such as contacting a 9-1-1 system. *Id*. at 84. The Court held that, although the defendant "may have been engaged in conduct that was indicative of either lawful or unlawful activity," the officers did not identify any facts to support the determination that "there was an objectively reasonable basis to suspect that he had committed or was committing a traffic violation." *Id.* at 126. It stated that, "where conduct observed by a police officer is consistent with" lawful or unlawful activity, the police are justified in conducting an investigatory stop only if they are "able to credibly identify specific facts, not applicable to a substantial portion of the general law-abiding public, 'which, taken together with rational inferences from those facts,'" reasonably establish that a crime is occurring. *Id.* at 87.

In distinguishing *D.D.*, the Court stated that *D.D.* did not "stand for the proposition that any time officers observe that a person has engaged in behavior that appears to be either completely innocent or innocuous conduct that could be indicative of lawful or unlawful behavior, officers have reasonable suspicion to stop the person to resolve any ambiguity as to the type of conduct the person has engaged in." *Id.* at 129. As indicated, the Court stated that its holding in *D.D.* addressed the unique situation posed by marijuana odor, which "remained indicative of criminal behavior," but the "premise of an investigatory stop being generally permissible to clarify any ambiguity with respect to a police officer's observations as to whether a person is or is not engaged in unlawful activity was not discussed or even mentioned in *D.D.*" *Id.* at 131. With that background in mind, we address reasonable suspicion in the context of possession of a gun.

**Reasonable Suspicion Based on Gun Possession**

To determine whether a police officer had reasonable suspicion to believe that a person was involved in criminal activity, we must look to the law alleged to be implicated. Section 4-203(a)(1) of the Criminal Law Article states:

Except as provided in subsection (b) of this section, a person may not:

(i)     wear, carry, or transport a handgun, whether concealed or open, on or about the person;

(ii)     wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State;

(iii)     violate item (i) or (ii) . . . while on public school property in the State;

(iv)     violate item (i) or (ii) . . . with the deliberate purpose of injuring or killing another person; or

(v)     violate item (i) or (ii) . . . with a handgun loaded with ammunition.

Md. Code Ann., Crim. Law ("CR") § 4-203(a)(1) (2025 Supp.). There are, however, numerous circumstances where handgun possession is not illegal, and those circumstances are set forth in CR § 4-203(b).[14] The relevant circumstance here is "the wearing, carrying,

---

[14] CR § 4-203(b) provides that § 4-203(a) does not prohibit wearing, carrying, or transporting of a handgun (1) in relation to the official duties of law enforcement, correctional officers, or members of the armed forces; (2) for permit holders; (3) while in transport to a retailer, repair shop, or between residences; (4) in connection with an organized military or sport shooting event, target practice, or certain state-sponsored classes; (5) by a gun collector to an exhibition; (6) at an individual's privately-owned or leased residence or business; (7) by an authorized supervisory employee; (8) for use as a distress signal on waterways; or (9) during surrender pursuant to court order.

or transporting of a handgun by a person to whom a permit . . . has been issued." CR § 4-203(b)(2).

Here, the police stopped appellant when Detective Ramsey saw a gun "printing" on appellant's shirt. A police stop based on reasonable suspicion that a person is in possession of a gun has consistently been upheld by the Maryland appellate courts as a proper *Terry* stop. *See State v. Smith*, 345 Md. 460, 463, 469 (1997) (investigatory detention permissible where officer observed the defendant place an object believed to be a handgun in the back waistband of his pants); *Quince v. State*, 319 Md. 430, 434 (1990) (stop and frisk was constitutionally permissibly because officer had reasonable and articulable suspicion that defendant was unlawfully carrying a handgun based on a reliable tip); *Allen v. State*, 85 Md. App. 657, 667-68 (investigatory stop permissible where officer had reasonable articulable suspicion that defendant was armed based on a tip and that the area was a known high crime area), *cert. denied*, 323 Md. 1 (1991). *See also Russell v. State*, 138 Md. App. 638, 653 (2001) (officer had reasonable suspicion to continue detention after traffic stop based on concealment of suspected handgun in defendant's pocket), *cert. dismissed as improvidently granted*, 368 Md. 43 (2002).

At the time these decisions were issued, Maryland had a "may issue" licensing scheme. *In re Rounds*, 255 Md. App. at 210. To prove the crime of wear, carry, or transport a handgun, the State merely had to prove possession of a gun, and the defendant had the option to raise, as "an affirmative defense to the 'wearing, carrying or transporting' of a handgun prohibition," that the defendant had a permit. *See Brogden v. State*, 384 Md. 631, 642-44 (2005).

Prior to *Bruen,* other courts held that, when it was presumptively unlawful under state law to carry a firearm, with exceptions including when an individual had a permit, a police officer with reasonable suspicion to believe that a person had a gun could conduct a *Terry* stop to determine the legality of the gun possession. For example, in *United States v. Rodriguez*, 739 F.3d 481, 488 (10th Cir. 2013), the court held that an officer had reasonable suspicion to stop and frisk the defendant based on the officer's observation of a handgun tucked in the defendant's waistband at a convenience store. The court held that, because New Mexico's statute provided that carrying a concealed weapon was presumptively unlawful, subject to exceptions including possession of a handgun license, the officer could detain the defendant based on reasonable suspicion of criminal activity. *Id.* at 489. It concluded that the exceptions in the law did not negate the officer's "reasonable suspicion that [the defendant's] possession of a concealed handgun was unlawful." *Id.*

Similarly, in *United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir.), *cert. denied*, 562 U.S. 1015 (2010), the court held that, under Delaware law, "carrying a concealed handgun is a crime to which possessing a valid license is an affirmative defense, and an officer can presume a subject's possession is not lawful until proven otherwise." The court stated that "it is presumed in Delaware that concealed handgun bearers are violating the law," and that "[a] suspect might later offer a license as an affirmative defense does not affect" the reasonable suspicion analysis under *Terry*. *Id.* at 379. *Accord United States v. Pope*, 910 F.3d 413, 416 (8th Cir. 2018) (reasonable suspicion to stop and frisk defendant with handgun in waistband because, under Iowa law, it is "presumptively criminal" to carry a

25

concealed weapon "until the suspect comes forward with a permit"), *cert. denied*, 589 U.S. 931 (2019); *United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012) (concealed handgun established reasonable suspicion where permit was affirmative defense to crime of handgun possession under Florida law).

Appellant contends, however, that this analysis changed after *Bruen*, where the United States Supreme Court held that gun possession is not only lawful, but it is a protected constitutional right. Appellant argues that, post-*Bruen*, gun possession "can no longer, on its own as in this case, constitute reasonable suspicion that a crime is afoot." He asserts that "what constitutes reasonable articulable suspicion of criminal activity must necessarily change as the law changes what conduct is illegal." Appellant argues that the police here did not have reasonable suspicion to stop him when he was "merely walking up the street in broad daylight with a concealed firearm," which is "broadly permissible under Maryland's 'shall-issue' licensing regime."

The State contends that the officers had reasonable suspicion to conduct an investigatory stop of appellant. It argues that the analysis of whether reasonable suspicion to believe a person is in possession of a gun justifies an investigatory stop depends on "each State's substantive criminal law, not *Bruen*."[15]

---

[15] We agree with the State to some extent, i.e., that the substantive criminal law in each state is important to the Fourth Amendment analysis. In states where it is lawful to carry a firearm without a permit, either openly or concealed, courts have held that a *Terry* stop based on mere possession of a firearm is not lawful. For example, in *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013), where North Carolina permitted individuals to openly carry firearms without a permit, N.C. Gen. State § 14-415.11, the court held that "the exercise of this right, without more, cannot justify an investigatory detention." Other

26

The State argued in its brief that *Bruen* did not alter the Fourth Amendment analysis in Maryland because, in this State, unlike other states, carrying a handgun is presumptively *unlawful* and becomes lawful only under certain exceptions, including possession of a permit. The State asserts that presumptions governing the legality of handgun possession "turn on each State's substantive criminal law, not *Bruen*." It contends that, under the legal standard for reasonable suspicion, "an officer need not know that a suspect carrying a handgun doesn't possess a valid permit to investigate that very fact."

As appellant notes, "post-*Bruen*, jurisprudence on the intersection of the Second and Fourth Amendment protections is in its infancy." Nevertheless, reported opinions that have addressed the issue presented here post-*Bruen*, and have analyzed *Bruen* in a holding regarding the existence of reasonable suspicion, have concluded, as appellant argues, that possession of a gun, without more, does not provide reasonable suspicion authorizing a stop.[16]

_____

courts similarly have held that when a state has a permitless carry law, a *Terry* stop is not permitted based on mere possession of a firearm. For example, in *Northrup v. City of Toledo Police Department,* 785 F.3d 1128, 1132-33 (6th Cir. 2015), the Court held that, because Ohio did not regulate the open carry of firearms under Ohio Rev. Code Ann. § 9.68(C)(1), officers had no reasonable suspicion to stop the defendant based on the openly visible handgun holstered on his hip. Similarly, based on Arizona law that allowed individuals to carry firearms openly or concealed without a permit, *see* Ariz. Rev. Stat. Ann. § 13-3102, the court in *State v. Serna,* 331 P.3d 405, 411 (Ariz. 2014), held that the State did not present evidence of probable cause or reasonable suspicion of criminal activity to justify a seizure based solely on the defendant's admission that he had a weapon. The analysis is different in Maryland because it is a crime to possess a gun without a license.

[16] As appellant notes, at least one state took this position pre-*Bruen*. In *Commonwealth v. Hicks*, 208 A.3d 916, 936-37 (Pa.), *cert. denied*, 589 U.S. 1117 (2019),

For example, in *United States v. Wilson*, 143 F.4th 647, 655-56 (5th Cir. 2025), the court addressed a *Terry* stop in the context of Louisiana's law, which, similar to Maryland, prohibited possession of a concealed firearm, but the prohibition did not apply to a person with a valid permit. The court rejected the district court's determination that this statute made possession of a firearm presumptively unlawful, justifying a *Terry* stop for anyone carrying a firearm. *Id.* at 656. It reasoned that a *per se* presumption of illegality was inconsistent with the Constitution's history and tradition, inconsistent with the *Terry* doctrine, which requires individualized suspicion and does not include a firearm exception, and inconsistent with the Fourth Amendment generally, which does not allow for suspicionless searches to combat general crime. *Id.* at 656-57. It noted that a "mere

the Supreme Court of Pennsylvania held that a police officer may not infer criminal activity merely from a person's possession of a concealed firearm, which was legal with a permit under 18 Pa. C.S. §§ 6105-06. The court held that, "[u]nless a police officer has prior knowledge that a specific individual is not permitted to carry a concealed firearm, and absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal matter, there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity." *Id.* at 937. The court stated: "When many people are licensed to do something, and violate no law by doing that thing, common sense dictates that the police officer cannot assume that any given person doing it is breaking the law. Absent some other circumstances giving rise to a suspicion of criminality, a seizure upon that basis alone is unreasonable." *Id.* at 945. *See also United States v. Willy*, 40 F.4th 1074, 1080 (9th Cir. 2022) (concluding, one month after *Bruen* but without citing that case, that because Washington allowed open carry and was a "shall issue" state for a concealed carry permit, possession of a gun did not support a *Terry* stop).

possibility of unlawful use of a gun is not sufficient to establish reasonable suspicion." *Id.* at 657 (quoting *United States v. Watson*, 900 F.3d 892, 896 (7th Cir. 2018)).[17]

The court said that a "per se presumption of illegality would have untenable consequences in other areas." *Id.* at 658. It compared gun licenses to driver's licenses, noting that "driving a car without a license is unlawful in every State," yet the United States Supreme Court had held that stopping a vehicle to verify compliance with license and registration requirements, without "articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered," violated the Fourth Amendment. *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)).[18] The court stated that "officers cannot assume that citizens engaging in an activity subject to licensing are unlicensed." *Id.*

Citing *Bruen*, the court stated that "the Constitution's prohibition on presuming illegality should be stronger for gun owners than for car drivers" because the right to carry

_____

[17] The court rejected the holding of some courts, and the position advocated by the State here, that a presumption of illegality could be inferred in states where a permit to carry was an affirmative defense at trial. *United States v. Wilson*, 143 F.4th 647, 655-56 (5th Cir. 2025). It noted that the issue of who had the burden to prove a particular element was a matter of state trial procedure, not Fourth Amendment analysis. *Id.* at 657-58. *See also Commonwealth v. Hicks*, 208 A.3d 916, 943-44 (Pa.), *cert. denied*, 589 U.S. 1117 (2019) (rejecting argument that seizure is permissible if a license is an affirmative defense as opposed to an element of the offense, stating that, although the legislature can define the elements of a crime, it cannot limit the scope of Fourth Amendment protection).

[18] In *Delaware v. Prouse*, 440 U.S. 648, 663 (1979), the United States Supreme Court held that, except in situations where there was "reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check the driver's license and the registration of the automobile are unreasonable under the Fourth Amendment."

a handgun is protected by the Second and Fourteenth Amendment. *Id.* at 659.  Regardless of how a state's permitting scheme was set up, possession of a gun was "*presumptively lawful*, nationwide," and police could not rely on a presumption that carrying a firearm was unlawful to justify a *Terry* stop.  *Id.*[19]

Similarly, in *People v. Dorsey*, 266 N.E.3d 1209, 1219 (Ill. App. Ct. 2025), the Appellate Court of Illinois held that "the mere possibility that anyone with a gun might not have a valid license is not enough to justify" a *Terry* stop.  The court concluded that, in a jurisdiction such as Illinois, where "carrying a firearm in public is permitted with a license," an individual's possession of a gun alone "is nothing more than the exercise of a protected constitutional right [and] cannot automatically subject a citizen to police detention."  *Id.* at 1218-19.  It noted that officers could, in a consensual encounter, verify the status of a citizen's licensure.  *Id.* at 1219.  Alternatively, they could conduct an investigatory stop if there were specific and articulable reasons to believe the citizen did not have a valid license or was "otherwise implicated in imminent criminal activity."  *Id.* The "mere possibility that anyone with a gun might not have a valid license," however, was not enough to justify a seizure.  *Id.*  For that, the police had to have specific and articulable reasons to believe that *this* person, observed in *these* circumstances, did not have a valid license – or that he was "otherwise implicated in imminent criminal activity." *Id.*  *Accord United States v. Jones*, 708 F. Supp. 3d 1365, 1375 (N. D. Ill. 2023) (mere

---

[19] The court ultimately upheld the *Terry* stop based on the totality of the circumstances, including the defendant's involvement with a fugitive and his proximity to known criminal activity.  *Id.* at 660.

possession of handgun, without further evidence of criminality, is not enough to show reasonable suspicion).

In *United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024), the Tenth Circuit held that officers did not have reasonable suspicion to stop the defendant based solely on an anonymous tip that three men had guns and looked like they were "getting ready to do something." Noting that the tip did not allege any criminal activity or dangerous behavior, the court stated that, "if we are to take seriously the normative thrust of . . . [*Bruen*], then we cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way." *Id.* at 778. Based on the totality of the circumstances, the court held the officer's detention of the defendant was unreasonable under the Fourth Amendment. *Id.* at 784.

To be sure, there have been a few courts that have stated in reported opinions after *Bruen* that the police have the authority to stop a person to investigate whether the individual with a handgun has a lawful permit. Those statements, however, in the cases cited to us, have been made either in dicta, without analysis, or without citation to *Bruen*.

For example, in *United States v. Libertad*, 681 F. Supp. 3d 102, 115-16 (S.D.N.Y. 2023), *aff'd on other grounds, United States v. Vereen*, 152 F.4th 89 (2d Cir. 2025), the court noted that courts had "long affirmed that reasonable suspicion that a person is carrying a gun suffices to support a brief *Terry* stop." The court initially acknowledged that, post-*Bruen*, it was "hard to say that suspicion or even knowledge that someone is carrying a gun constitutes suspicion or knowledge of criminal activity." *Id.* at 116. It then stated that this specific question was not before the court because the stop there occurred

31

prior to *Bruen*, when New York still had a highly restrictive licensing scheme limiting a person's ability to obtain a license to carry a firearm outside the home. *Id.* The court held that, because the stop was prior to *Bruen*, there was reasonable suspicion of unlawful activity. *Id.* Nevertheless, the court went on to state, in dicta, that it doubted that, even after *Bruen*, the police could not stop someone carrying a gun and verify that the person was doing so lawfully. *Id.* at 116-17.

In *United States v. Homer*, 715 F. Supp. 3d. 413, 421 (E.D.N.Y.), *reconsideration denied in relevant part*, 2024 WL 1533919 (2024), the court held that there was no *probable cause* to arrest a defendant who officers observed sitting in a vehicle known to be used for gang activity and placing a handgun in his pants pocket without "firearm discipline." The court noted that, under the stricken "proper cause licensing regime" prior to *Bruen*, where it was difficult to obtain a firearm license, it was reasonable for the police to believe that a person in possession of a gun was committing a crime. *Id.* at 419. After *Bruen*, however, the New York legislature amended the firearm licensing regime to make gun licenses for firearms "significantly more accessible." *Id.* At that point, the "licensing exception that police could have reasonably disregarded before *Bruen* was substantially broadened so that police can no longer reasonably assess whether a person was committing a crime without taking the exception into account." *Id.* The court held that, to establish probable cause after *Bruen*, the police "must point to facts in the lead up to the arrest that indicate to the arresting officer, based on his experience and expertise, that [the defendant] did not have a license to carry the firearm." *Id.* at 420.

32

The court went on to note, however, in dicta, that the officers had other options after *Bruen*. It stated, without analysis, that "[e]ven after *Bruen*, police officers have reasonable suspicion to justify a *Terry* stop when seeing someone they suspect has a gun." *Id.* at 422. The court stated that the officer could have stopped Homer and "conducted a *Terry* frisk to remove the gun while they determined, after running [a] license check, whether there was probable cause to arrest [the defendant]." *Id.* It stated that a *Terry* stop provides the police "the tools to ensure that they protect the right of the public to be free from unreasonable searches and seizures while preventing the unlawful possession and carrying of firearms." *Id.*[20]

We have carefully reviewed the cases in other jurisdictions, the holding in *Bruen*, 597 U.S. at 17, 32 that the Constitution "presumptively protects" gun possession, and the decisions by the Maryland Supreme Court in *Stone,* 493 Md. at 88, and *Williams,* 401 Md. at 692. Based on this review, we hold that, post-*Bruen*, reasonable suspicion to believe that a person is carrying a gun, by itself, no longer justifies a *Terry* stop.

Our colleagues filing concurrences have discussed the danger posed by guns. *Hicks v. State*, ___ Md. App. ___, No. 634, Sept. Term 2024 (filed June 4, 2026) (Berger,

---

[20] On motion for reconsideration, the court declined to reconsider its opinion based on an affidavit that showed that the number of concealed carry licenses did not meaningfully increase between the date of the *Bruen* decision and the date of Homer's arrest eight months later. *United States v. Homer*, No. 23-CR-86, 2024 WL 1533919, at *10-11 (E.D.N.Y. Apr. 9, 2024), *appeal withdrawn*, 2024 WL 4556459 (2d Cir. 2024). In addition to the Government's failure to timely present the affidavit, the court noted that the probable cause inquiry was "incapable of precise definition or quantification into percentages," and reducing the probable cause determination to an exact formulaic equation was not permitted. *Id.* at *11 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

33

Friedman, and Shaw, JJ., concurring), slip op. at 12-13 n.6, 26-28 (Joint Concurring Opinion); *Hicks v. State*, ___ Md. App. ___, No. 634, Sept. Term 2024 (filed June 4, 2026) (Leahy, J., concurring), slip op. at 12 (Leahy Concurring Opinion).  We agree that guns can be dangerous, a concern echoed by the United States Supreme Court when *Terry* was decided in 1968.  *See Terry*, 392 U.S. at 31-32 (Harlan, J., concurring) (concealed weapons can "create an immediate and severe danger for the public").

Since the time of *Terry*, however, there have been major changes in the law with respect to possession of firearms.  In 1968, when *Terry* was decided, the law of Ohio, the state at issue in *Terry*, made it a crime to possess a concealed firearm, with an exception only for law enforcement.  *Id.* at 4 n.1.  Thus, it was probable that a person on the street who was not in law enforcement was committing a crime if they possessed a gun in public.  Similarly, in Maryland at the time, the possession of a dangerous weapon concealed or openly with the intent to injure was a crime, with exceptions for officers of the government and persons carrying weapons "as a reasonable precaution against apprehended danger."  Md. Code, Art. 27, § 36(a) & (b) (1957, 1967 Repl. Vol.).  *See State v. Crawford*, 308 Md. 683, 693 (1987).

States subsequently created more exceptions to the crime of possession of a gun, including for those who obtained licenses.  Maryland added that exception in 1969.  Md. Code, Art. 27, § 36(a) & (b) (1957, 1969 Cum. Supp.).[21]  Based on this statutory scheme,

___

[21] In 1972, the General Assembly enacted more stringent regulation of handguns based on the large increase in crimes committed with handguns.  *State v. Crawford*, 308 Md. 683, 693-94 (1987).

34

possession of a handgun was presumptively illegal, and having a permit was an affirmative defense. *See Brogden*, 384 Md. at 642-43. Accordingly, the Maryland appellate courts consistently held that reasonable suspicion that a person was in possession of a concealed weapon justified an investigatory stop.

In *Bruen*, however, the United States Supreme Court changed the legal landscape. After *Bruen,* carrying a handgun publicly for self-defense is presumptively lawful. *See Bruen*, 597 U.S. at 17, 32 (where Second Amendment's plain text covers an individual's conduct, such as carrying a handgun publicly for self-defense, "the Constitution presumptively protects that conduct"); *Wilson*, 143 F.4th at 659 (after *Bruen,* possession of a gun is "presumptively lawful nationwide"); *see also Commonwealth v. Guardado*, 206 N.E. 3d 512, 522 (Mass.) (indicating that a statute that presumes criminality from constitutionally protected conduct is unconstitutional)*, vacated in part on other grounds,* 220 N.E. 3d 102 (2023), *cert denied*, 144 S. Ct. 2683 (2024); *Higbie v. James*, 795 F.Supp.3d 307, 333 (N.D.N.Y. 2025) ("[R]egardless of how States' permitting schemes are set up, keeping and bearing arms is *presumptively lawful* nationwide.") (quoting *Wilson*, 143 F.4th at 659). Without a presumption of illegality, mere possession of a handgun is not, by itself, indicative of criminal activity that justifies an investigatory stop.

To be sure, this holding is a big change in the law. Arguably, it is not a positive change, to the extent that it limits the ability of the police to thwart danger to the public.[22]

---

[22] As we explain below, however, and as Judge Nazarian further explains in his concurring opinion, *see Hicks v. State*, ___ Md. App. ___ No.634, Sept. Term 2024 (filed June 4, 2026) (Nazarian, J., concurring), slip op. at 2-5, the practical effect of the opinion

Nevertheless, our holding that mere possession of a handgun, by itself, does not provide reasonable suspicion to support a *Terry* stop is, in our view, compelled by *Bruen*. And it is consistent with the Supreme Court of Maryland's holding in *Stone* that, "where conduct observed by a police officer is consistent with" lawful or unlawful activity, the police are justified in conducting an investigatory stop only if they are "able to credibly identify specific facts, not applicable to a substantial portion of the general law-abiding public, 'which, taken together with rational inferences from those facts,'" reasonably establish that a crime is occurring. *Stone*, 493 Md. at 87 (quoting *Terry*, 392 U.S. at 21). *Accord Williams,* 401 Md. at 692 (to justify a stop for illegal window tinting, the officer must credibly articulate why the officer believed the tinting was illegal). *See also Prouse*, 440 U.S. at 663 (unless there is a particularized suspicion that a driver is unlicensed, officers are prohibited from stopping drivers solely to ensure compliance with licensing and registration laws).

Our holding does not, however, leave the police powerless. As indicated, the police are permitted to engage in a consensual encounter with an individual; they can approach someone and ask if they have a license. *See Terry*, 392 U.S. at 34 (White, J. concurring) ("There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.").

---

may not be as far-reaching as some predict. It does require, however, that the police identify factors that indicate that the person is possessing a firearm illegally before conducting a *Terry* stop.

Moreover, if there are circumstances, in addition to the possession of a firearm, that give the police reason to suspect that the person is possessing the gun illegally, or otherwise is involved with criminal activity, the police lawfully can stop the person. The mere possibility, however, that a person with a gun might not have a valid license, or may otherwise be restricted from possessing a gun, is not enough, by itself, to justify a seizure. To justify a stop based on possession of a gun, the police must have reasonable suspicion that the person is possessing the gun illegally.[23]

In this case, the police did not testify that they believed that appellant was possessing the gun illegally, and no argument was made to the suppression court to that effect. The case was presented below as a stop justified solely on the possession of a gun, and it was presented in the briefs on appeal the same way. That is the argument that we have addressed, and it is the basis for our conclusion that the stop was unconstitutional.

---

[23] As provided in Md. Code Ann., Pub. Safety ("PS") § 5-133(b) (2025 Supp.), a person may not possess a regulated firearm if the person: (1) has been convicted of a disqualifying crime; (2) has been convicted of a common law crime and received a term of imprisonment of more than 2 years; (3) has been convicted of impermissibly providing access of a loaded firearm to a minor; (4) is on probation after conviction of a crime punishable by 1 year or more, for violation a protective order, or for driving while impaired; (5) is a fugitive; (6) is a habitual drunkard; (7) is addicted to a controlled dangerous substance or is a habitual user; (8) suffers from certain mental disorders and has a history of violent behavior against another person; (9) has been found incompetent to stand trial; (10) has been found not criminally responsible; (11) has been voluntarily admitted for more than 30 days or to a mental health facility; (12) has been involuntarily committed to a mental health facility; (13) is under the protection of a court-appointed guardian unrelated to a physical disability; (14) is subject to a civil protective order; or (15) is under the age of 30 and has been adjudicated delinquent for an act that would be a disqualifying crime if committed by an adult. With certain exceptions, a person under the age of 21 may not possess a regulated firearm. PS § 5-133(d).

**D.**

**Concurring Opinions**

The Joint Concurring Opinion asserts that the Court should not consider the issue presented below and in the briefs to this Court because the State could have argued other reasons that the police had reasonable suspicion to justify the initial stop. We have several responses to this assertion.

Initially, we note that the decision to address grounds not raised below is, as the Joint Concurring Opinion acknowledges, a discretionary decision. *See State v. Bell*, 334 Md. 178, 187-88 (1994). We decline to exercise our discretion here. The parties on appeal addressed this case as presenting the question whether *Bruen* changed the conclusion reached in Maryland in previous cases, i.e., that possession of a gun, by itself, provided reasonable suspicion to support a *Terry* stop. This is an important issue that needs to be resolved; we have had several other cases, in addition to this one, that have raised the issue. The issue will continue to present itself, and the police need to know what they are permitted to do under the Fourth Amendment. Indeed, a majority of the Court voted to take the unusual step of hearing this issue in banc.[24] One could wonder why we would do that and then decline to consider the issue.

Moreover, even if we were inclined to avoid the issue raised below and in the briefs on appeal, which we are not, we are not convinced that the record was developed

---

[24] The last time this Court heard a case in banc was 14 years ago. *See Exxon Mobil Corp. v. Ford*, 204 Md. App. 1 (2012), *aff'd in part, rev'd in part*, 433 Md. 426 (2013).

sufficiently to support a finding of reasonable suspicion. Although we will not discuss each fact listed by the concurrences, we note that we have already discussed the blading testimony, *supra* at pp. 4-5, n.4. To the extent that there is a suggestion that a gun alone gives rise to reasonable suspicion or diminishes the quantum of other factors needed for reasonable suspicion, we note that the United States Supreme Court has rejected "a public safety and firearm exception to *Terry's* reasonable suspicion analysis." *United States v. Mitchell,* 796 F. Supp.3d 1357 (2025) (quoting *Florida v. J.L.*, 529 U.S. 266 (2000). Possession of gun, after *Bruen,* justifies a *Terry* stop only if there is reasonable suspicion that the gun is being possessed illegally or the person is otherwise engaged in criminal activity.

Although there may be an argument in a future case that a stop is justified based on PS § 5-307(b)(1), which requires that a person with a permit carry the gun concealed, this argument was not raised in this case by the parties below or on appeal, presumably because the statute was not effective until October 1, 2023, after the July 5, 2023 stop here. If the statute is raised as a justification for a stop in a future case, the issue of what constitutes a violation of that statute, including the exception for a momentary and inadvertent exposure of the imprint of a handgun, *see* PS § 5-307(b)(2), can be litigated. That, however, is not an issue presented here, and it is not, in our view, a reason not to address the issue that was presented.

**E.**

**Conclusion**

In sum, *Bruen* substantially changed the legal landscape in holding that a person has a protected right to carry a handgun for self-defense outside the home. Although the Maryland appellate courts have, for decades, upheld police stops based on reasonable suspicion that a person is in possession of a gun, after *Bruen,* carrying a handgun publicly for self-defense is presumptively lawful, and therefore, mere possession of a concealed firearm, by itself, is not indicative of criminal activity. The mere possibility that a person with a gun might not have a valid license or otherwise may be restricted from possessing a gun is not enough to establish reasonable suspicion for a seizure. The police must have reasonable suspicion that the person is possessing the gun illegally or otherwise engaged in criminal activity. Because the officers here stopped appellant based solely on his possession of a gun, without reasonable suspicion that he was possessing the gun illegally or otherwise involved in criminal activity, they did not have reasonable suspicion to stop him.[25] The stop, therefore, violated appellant's Fourth Amendment right against unreasonable seizures.

---

[25] The concurring opinions discuss Maryland's policy decisions to protect the public from the threat of handguns, as well as the provisions of CR § 4-206(a)(1)(i)-(ii), which authorizes an officer "to both stop and conduct a limited frisk of a person when the police officer 'reasonably believes that' the person 'may be wearing, carrying, or transporting a handgun' and that 'because the person possesses a handgun, the person is or presently may be dangerous to the officer or to others.' CR § 4-206(a)(1)(i)-(ii)." Joint Concurring Opinion at 26-27; Leahy Concurring Opinion at 4-7. As the dissent in *Stone* explained, however, the legislature's policy decisions regarding appropriate police conduct does not have any effect on the Fourth Amendment analysis. *State v. Stone*, 493 Md. 78, 140-41 (2026) (Gould, J., dissenting).

## III.

### *Terry* Frisk

Because there is an argument that there were sufficient facts to support a stop, and neither the United States Supreme Court nor the Supreme Court of Maryland have weighed in on the requirements for the police to stop a person possessing a gun after *Bruen*, we will go on to address the propriety of the frisk. As an alternate holding, we hold that, even if the stop was reasonable, the frisk was improper.

Appellant makes two arguments in support of his contention that the frisk was improper. First, he argues that the frisk was improper at its inception because there was no reason to believe that he was dangerous. Second, he asserts that the police exceeded the scope of a proper frisk. As explained below, we disagree with the first argument but agree with the second argument.

### A.

### Armed and Dangerous

Appellant contends that the court erred in finding that the frisk was justified because the police lacked reasonable suspicion that appellant was dangerous. He asserts that presuming a suspect is dangerous "from the exercise of a protected right and lawful activity is illogical and inconsistent with *Bruen*," and there were no other circumstances indicating that he was dangerous. Appellant notes that the record shows that he was compliant with the officers' orders, never reached for his gun, did not act suspiciously, and offered to show the officers his permit.

41

The State contends that the "same reasonable suspicion that justified the investigatory stop also justified the frisk." It argues that the "absence of affirmative testimony about the officers' subjective concern for their safety [did not] invalidate the frisk" because the "'armed and dangerous' standard is unitary," and "reasonable suspicion that a person is armed is per se a reasonable suspicion that the person is dangerous, warranting a frisk for weapons."

"During a *Terry* stop, for the sake of the safety of the law enforcement officer and others, a law enforcement officer may frisk a person who the law enforcement officer has reason to believe is armed and dangerous." *Norman*, 452 Md. at 387. The purpose of a *Terry* frisk is to protect "the officer making the stop." *Smith*, 265 Md. App. at 103 (quoting *Lockard v. State*, 247 Md. App. 90, 102 (2020)). *Accord Bailey v. State*, 412 Md. 349, 368 (2010) (purpose of *Terry* frisk is to "protect the police officer and bystanders from harm by checking for weapons"); *Ames v. State*, 231 Md. App. 662, 674 (2017) (purpose of *Terry* frisk is to assure officers "that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him") (quoting *Terry*, 392 U.S. at 23). As the State correctly notes, the test "is objective: the validity of the stop or frisk is not determined by the subjective or articulated reasons of the officer; rather, the validity of the stop or frisk is determined by whether the record discloses articulable objective facts

to support the stop or frisk." *In re D.D.*, 479 Md. at 243 (quoting *Sellman v. State*, 449 Md. 526, 542 (2016)). [26]

The United States Supreme Court has treated the *Terry* "armed and dangerous" test as a unitary standard, which links the terms armed and dangerous and permits a frisk when a person is armed. *See Terry*, 392 U.S. at 28 ("[A] reasonably prudent man would have been warranted in believing petitioner was armed *and thus* presented a threat to the officer's safety.") (emphasis added); *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (per curiam) (bulge in jacket permitted officer to conclude that defendant "was armed *and thus* posed a serious and present danger to the safety of the officer") (emphasis added).

At least one federal circuit court has interpreted *Terry* and *Mimms* as "deliberately link[ing] 'armed' and 'dangerous,' recognizing that the frisks in those cases were lawful because the stops were valid and the officer reasonably believed that the person stopped 'was armed <u>and thus</u>' dangerous." *United States v. Robinson*, 846 F.3d 694, 700 (4th Cir. 2017) (en banc). The *Robinson* court noted that "[i]t was thus [defendant's] status of being armed during a forced police encounter . . . that posed the danger justifying the frisk." *Id. But cf. Northrup v. City of Toledo Police Dept.*, 785 F.3d 1128, 1132-33 (6th Cir. 2015) (*Terry* requires a finding that an individual is "armed *and dangerous*" before a stop and

---

[26] Although the test is objective, Officer Ramsey specifically testified regarding concerns for safety, stating that appellant's hands were secured "[p]rimarily because, obviously, training, officer safety, if I can secure his hands, he can't get to the firearm in his waistband." He also testified that, when he asked appellant to raise his arms, appellant "didn't raise them" and appellant's "right hand [wa]s in close proximity to where [he] observed the firearm."

frisk is permitted, and allowing *Terry* stops and searches based solely on possession of a handgun "would effectively eliminate Fourth Amendment protections for lawfully armed persons," particularly in states that have "decided its citizens may be entrusted with firearms on public streets"). *Accord State v. Serna*, 331 P.3d 405, 410 (Ariz. 2014) (*Terry* "involves a dual inquiry; it requires that a suspect be 'armed *and* presently dangerous'").

Appellant contends, however, that this line of reasoning does not survive post-*Bruen*. He asserts that "[p]resuming danger[ ] from the exercise of a protected right and a lawful activity is illogical and inconsistent with *Bruen*." We disagree.

To be sure, after *Bruen*, there undoubtedly are more people in Maryland with permits to carry a concealed handgun. Nevertheless, *Bruen* did not indicate that a constitutional right to bear arms changes the Fourth Amendment law that, when the police stop a person believed to be armed, they can conduct a brief frisk for their safety. The United States Supreme Court has specifically rejected the argument that a frisk might not be warranted if the suspect is carrying the gun legally. In *Adams*, 407 U.S. at 146, the Court explained:

> [A] frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law. So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.[27]

---

[27] In Connecticut, the state where the stop occurred, citizens were permitted to carry weapons, openly or concealed, if they had a permit. *Adams v. Williams*, 407 U.S. 143, 149 (1972) (Douglas, J., dissenting).

44

*Accord Michigan v. Long*, 463 U.S. 1032, 1052 n.16 (1983) (Supreme Court has "expressly rejected the view that the validity of a *Terry* [frisk] depends on whether the weapon is possessed in accordance with state law").

Here, the circuit court, in rejecting appellant's argument, relied on the risk to police officers. It stated that officers cannot "risk their safety and . . . the safety of others in the community" based on an individual's unconfirmed declaration that he has a permit for a weapon. Moreover, even with a permit, an individual with a weapon can still pose a danger to the police, himself, and the public in general because, at any moment, an armed person could "just start shooting everyone."

This Court similarly stated, in *Sizer*, 230 Md. App. at 651, that, because a *Terry* frisk is predicated on "an officer's fear for his own safety when confronting a suspect who the officer reasonably believes may be armed or dangerous[, a] suspect with a licensed handgun is just as dangerously armed as is a suspect with an unlicensed handgun." *Id.* at 651. We further explained:

> Licensed handguns shoot bullets that are just as deadly as are those from unlicensed handguns. A permit to carry a handgun would no more vitiate the need for a frisk than would the suspect's promise not to shoot anybody with it. Even if the stopee had his permit to carry a handgun pinned to the front of his shirt and even if the officer read it before conducting the frisk, that would in no way eliminate or even diminish the need for the frisk. Indeed, it would enhance the need. Per se illegality is simply not a requirement for the reasonable articulable suspicion to support a Terry frisk.

*Id.*

The Supreme Court of Maryland agreed that, after an officer has been informed that a suspect is armed with a weapon, there is reasonable suspicion to frisk him. *Sizer*, 456

45

Md. at 374. Other courts similarly agree that a gun is a "dangerous weapon," and officers are permitted to frisk armed suspects regardless of the potential legality of the possession "to pursue their investigation without fear of violence." *Rodriguez*, 739 F.3d at 491 ("We will not deny an officer making a lawful investigatory stop the ability to protect himself from an armed suspect whose propensities are unknown."); *Robinson*, 846 F.3d at 701 ("[T]he legality of the frisk does not depend on the illegality of the firearm's possession.").

Nothing in *Bruen* changes the rationale of these cases, which hold that an officer may conduct a limited *Terry* frisk for officer safety when a suspect is armed. Here, there is no dispute that appellant was armed with a handgun, which the officers observed printing in his waistband. If there had been a proper stop, the police had reasonable suspicion to conduct a brief frisk for weapons.

### B.

### Scope of Frisk

Appellant contends, however, that even if a frisk was justified, Detective Rodriguez exceeded the scope of the pat-down by putting his hands in appellant's pockets and cross-body bag. He contends that these actions exceeded the scope of a permissible *Terry* frisk. Appellant asserts that the State could not satisfy its burden of proof under the plain view and plain feel doctrines because Detective Rodriguez was not called to testify. The State disagrees.[28] It contends that the court's findings that Detective Rodriguez lawfully seized

---

[28] The State contends that appellant did not preserve his challenge to the frisk, asserting that appellant did not raise the scope of the frisk as an issue at the suppression hearing. Based on the record, we conclude that appellant sufficiently raised the issue that

46

the second handgun and the cocaine through the plain sight and plain feel doctrines was supported by the body-worn camera footage.[29]

A *Terry* frisk "'is limited to a pat-down of the outer clothing' and its purpose is 'not to discover evidence of a crime, but rather to protect the police officer and bystanders from harm by checking for weapons.'" *Sellman v. State*, 449 Md. 526, 543 (2016) (quoting *Bailey*, 412 Md. at 368). *Accord McDowell v. State*, 407 Md. 327, 338 (2009) (officer can pat down bags to determine presence of weapon); *Jordan v. State*, 72 Md. App. 528, 536-37 (1987) (pat down of bag reasonable where officer believed it contained a gun). An officer "may not exceed the limited scope of a patdown for weapons to search for contraband." *Bailey,* 412 Md. at 369. "General exploratory searches are not permitted [pursuant to *Terry*], and police officer must distinguish between the need to protect themselves and the desire to uncover incriminating evidence." *Id.* (quoting *In re David S.*, 367 Md. at 545).

Here, the police exceeded the scope of a limited pat-down. The State does not argue to the contrary. Detective Rodriguez reached into appellant's bag and pulled out the gun,

---

the officers exceeded the scope of their authority by searching appellant instead of patting him down.

[29] The State also relies on the statement of probable cause. Although that was shown to the trial judge, it was not admitted into evidence. Appellant contends, and the record appears to confirm, that it was shown to the judge early in the proceeding in the context of potentially reaching a plea. Because the statement of probable cause was not admitted into evidence, we will not consider it. *See, e.g., Carter v. State*, 367 Md. 447, 457 (2012) (appellate review of a suppression motion "is limited to the evidence presented at the suppression hearing"); *Hicks v. State*, 268 Md. App. 1, 7 n.1 (2025) (declining to consider written impoundment policy not admitted into evidence at the suppression hearing).

47

and he reached into appellant's pocket and pulled out the cocaine. "[A] more intrusive *Terry* frisk may be constitutionally permissible in the rare instance where a police officer is unable to perform an effective pat-down." *State v. Smith*, 345 Md. 460, 466 (1997). Thus, in *Adams*, 407 U.S. at 144-45, where the officer had information that appellant had a gun concealed at his waist and asked the suspect to open the car door, but Adams instead lowered the window, the officer was unable to conduct a pat-down, and it was reasonable for the officer to reach into the car and seize the gun from Adams' waistband to ensure his safety. *Smith*, 345 Md. at 466.

As the Supreme Court of Maryland has explained:

> When a container is subjected to a more intrusive search in lieu of a pat-down, the State can sustain its burden of proof that the search was reasonable either by having the officer explain why it was necessary to conduct that search or by demonstrating from the container itself that a pat-down would not have revealed the presence or absence of a weapon.

*McDowell,* 407 Md. at 341. In that case, the Court held that the search of a bag was unreasonable where the officer "offered no explanation for why a pat-down would not have sufficed." *Id.* Similarly, here, there was no testimony that a pat down of the bag and the pocket was not sufficient to determine if appellant was armed and dangerous.

The State argues that Detective Rodriguez "lawfully seized the second handgun in [appellant]'s 'open' satchel through the plain-sight doctrine, and the cocaine in his front pants pocket through the 'plain feel' doctrine, respectively." The plain view doctrine requires three elements to be met: "(1) the officer must be lawfully 'at the place from which the evidence could be plainly viewed'; (2) the 'incriminating character' of the item in question must be 'immediately apparent'; and (3) the officer 'must also have a lawful

right of access to the object itself.'" *McCraken v. State*, 429 Md. 507, 516 (2012) (quoting *Horton v. California*, 496 U.S. 128, 136-37 (1990)). "Immediately apparent" means an officer, upon observing the item, has probable cause to believe the "item in question is evidence of a crime or is contraband." *Id.* (quoting *Arizona v. Hicks*, 480 U.S. 321, 323 (1987)).

The rationale of the plain view doctrine applies equally to situations where law enforcement "discovers contraband or evidence of a crime through a sense of touch." *Id.* The Court has explained the plain feel doctrine, as follows:

> [I]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Id.* at 517 (quoting *Minnesota v. Dickerson,* 508 U.S. 366, 375-76 (1993)).

The State bears the burden of proving all three elements of the plain view/plain feel doctrine. *Coomes v. State,* 74 Md. App. 377, 387, *cert. denied*, 313 Md. 8 (1988). *Accord Martin v. State*, 267 Md. App. 556, 594 (2025). "[I]f, upon our independent constitutional reflective review of the evidence . . . we determine that the State failed to prove any one of the . . . requirements of the plain view doctrine, reversal of the denial of the motion to suppress is mandated." *Coomes*, 74 Md. App. at 387-88.

In *Coomes*, 74 Md. App. at 384, the defendant was convicted of drug offenses after the police, executing a search warrant that authorized a search of Coomes' home for a black handgun, found drugs. The State argued that the seizure was justified under the plain view

doctrine. *Id*. at 384-85. Because the officers who seized the items did not testify, and the officer who did testify was unable to testify that the items were found in plain view, the State could not rely on the plain view doctrine. *Id.* at 388-89. Moreover, "there was no evidence produced from which the court could have concluded that the seizing officers, by reason of their training and experience, had probable cause to believe that the items seized were marijuana and paraphernalia," and therefore, there was no evidence that it was "readily apparent" to the officers that the items were contraband. *Id.* at 389-90. Accordingly, this Court held that there was insufficient evidence to establish probable cause based on the plain view doctrine. *Id.* at 389. *See also United States v. Kiyuyung*, 171 F.3d 78, 83-84 (2d. 1999) (government did not meet burden under plain view doctrine where officer who discovered gun in plain view did not testify); *United States v. Davis*, 565 F. Supp. 2d 841, 870 (N.D. Ohio 2008) (government did not establish that the drugs pulled out from appellant's pockets were properly seized under the plain feel doctrine).

Here, Detective Ramsey was the only witness for the State. He testified that he did not personally perform "any kind of pat down," did not find the second gun, and did not feel the "trash cans" in appellant's left pocket. Rather, he testified that "[o]nce it was recovered, yes, I saw the CDS." Detective Rodriguez, who conducted the pat down and found the second gun and the cocaine, did not testify.

The circuit court stated that Detective Rodriguez saw something in appellant's open bag, "put his hand in, and then he immediately took his hand out, waited, and said we got a weapon . . . 'We got a firearm inside the bag.'" Detective Rodriguez, however, did not

50

testify to that effect, and there was no evidence regarding what, if anything, Detective Rodriguez observed in the bag prior to reaching into it and then taking the gun.[30]

Similarly, there was not sufficient evidence that the drugs pulled out from appellant's pockets were properly seized under the plain feel doctrine. To be sure, the body-worn camera footage shows Detective Rodriguez patting down appellant. There was no testimony, however, that based on what Detective Rodriguez felt during this pat-down, he knew that there were illegal drugs contained therein. The State failed to show, as was its burden, that, based on a limited pat-down frisk, it was immediately apparent to Detective Rodriguez that the pocket contained contraband.

Based on the record here, the State failed to meet its burden of proving the plain view and plain feel doctrines applied to justify the seizure of the drugs and the gun in the satchel. The court erred in denying appellant's motion to suppress the CDS and the second handgun discovered during the frisk.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

---

[30] The State asserts that the court's findings are supported by the body-worn camera footage. It provides no specific cite to the footage, however, and our review of the footage does not indicate what exactly Detective Rodriguez saw in the open pocket of the satchel. The video does not sustain the State's burden of proof here.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 634

September Term, 2024

_____

IN BANC

_____

STEVEN HICKS

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Graeff,
Berger,
Nazarian,
Arthur,
Leahy,
Reed,
Friedman,
Shaw,
Zic,
Ripken,
Tang,
Albright,
Kehoe, S.,

JJ.

_____

Concurring Opinion by Berger, J.,
Friedman, J., and Shaw, J.

_____

Filed: June 4, 2026

We concur in the judgment that the frisk exceeded constitutional limits and that the motion to suppress should have been granted. We write separately, with respect for our colleagues in the majority, because we would have reached that conclusion by a different and shorter path—one that did not require engaging the Second Amendment at all.

The majority's analysis moves through a long sequence of difficult questions. We see each of those questions differently, and at each stage, our reading would have resolved the case without going further. We set out those disagreements in order, from the narrowest ground to the broadest, in the hope that the progression itself illuminates why we think the constitutional question was never necessary.

We begin with a review of the record under the correct standard. The majority applies a standard of review we cannot join, and applying what we believe to be the right one reveals three additional facts that, considered together with the visible imprint of the weapon, establish reasonable suspicion under the totality of the circumstances. That would have ended the case.

If the majority is right about the standard of review, or if the additional facts are not enough, we would then address *Bruen*. The language in *Bruen* on which the majority relies is, in our reading, *dicta*. We do not think *Bruen* disturbed Maryland's established *Terry* stop framework, and we would not have reached the Second Amendment on that basis.

If the majority is right that *Bruen* applies as it holds, we would explain why brief stops to verify permit status and to protect officer safety while doing so, remain permissible under the Fourth Amendment. And if that analysis is also mistaken, Maryland's statutory scheme—which continues to treat public handgun carry as presumptively unlawful, with

the permit functioning as an affirmative defense—would support the stop under existing law.

All of which brings us to the point of agreement: the frisk went too far. Whatever justified the stop, the search that followed exceeded the limits the Fourth Amendment imposes. That conclusion was available at the outset, without any of the analysis the majority undertakes. We would have stopped there.

## I.

### A. Totality of the Circumstances: Standard of Review

The suppression record contains additional facts—undisputed and legally significant—that independently establish reasonable suspicion under the totality of the circumstances. To explain why we may consider them, we turn first to the standard of review, which both authorizes our consideration of the full record and tells us how to read it when the suppression court's findings are incomplete.

We respectfully disagree with the majority that the visibility of Hicks's handgun is the only fact that we may consider in determining whether the police had reasonable suspicion to stop him. The majority considers the gun and omits three additional facts in the suppression record: (1) Hicks walked away from police upon seeing the unmarked police vehicle; (2) he bladed his body as he crossed behind the unmarked vehicle; and (3) his hand was in close proximity to the handgun when officers approached. In addition, the majority omits relevant context: the officers' awareness of a recent homicide in the area. The majority concludes that because the State argued before the suppression court

2

that the stop was permitted on the basis of the gun alone, these additional circumstances are unavailable as a basis for affirmance. Majority Opinion at 38.

When reviewing the denial of a motion to suppress, we view the evidence and reasonable inferences therefrom in the light most favorable to the prevailing party. *Davis v. State*, 426 Md. 211, 219 (2012). Our review "is limited to the record developed at the suppression hearing." *Moats v. State*, 455 Md. 682, 694 (2017). Although we accept the suppression court's factual findings unless they are clearly erroneous, where "a party has raised a constitutional challenge to a search or seizure, *we must make an independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case.*" *Grant v. State*, 449 Md. 1, 14-15 (2016) (citing *State v. Wallace,* 372 Md. 137, 144 (2002)) (emphasis added). *Grant* requires us to apply the law to the full factual record before the suppression court.

The question at a suppression hearing is not the officers' *subjective* beliefs at the moment they initiated the stop. Instead, the reasonable suspicion standard is *objective*. *Ransome v. State*, 373 Md. 99, 112 (2003) (Raker, J., concurring) ("The reasonable, articulable suspicion standard is an objective standard, not a subjective one, and does not hinge upon the subjective belief of an officer."). The question is whether the articulable facts known to the officers would lead a reasonable person to believe the stop was justified. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) ("it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or search" create reasonable suspicion); *Ferris v. State*, 355 Md. 356, 384 (1999). The officers' state of mind—their hunches, assumptions, personal understanding of the law—

3

is beside the point. This is not a technicality. The objectivity of the standard is what gives the Fourth Amendment its content. A rule keyed to the officers' subjective understanding would provide no meaningful check on police conduct, because it would allow the legality of a stop to turn on whatever the officer happened to think, reasonable or not.

We acknowledge that before the suppression court, the parties focused their arguments on the officers' observation of Hicks's visible carry of a handgun, and the circuit court, in turn, rested its reasonable suspicion ruling on that same observation. But in our independent constitutional evaluation of the case, we should not be foreclosed from considering additional facts presented to the suppression court that neither the parties nor the suppression court expressly relied upon. Indeed, our cases recognize that, so long as the suppression record contains sufficient evidence to do so, we have discretion to affirm the suppression court's decision on an alternate basis. *Martin v. State*, 267 Md. App. 556, 574 (2025) (citing *Rush v. State*, 403 Md. 68, 103 (2008); *Powell v. State*, 139 Md. App. 582, 589-90 (2001)). We do not interpret the State's focus on Hicks's issue as a waiver of other issues.

Judge Charles E. Moylan, Jr., writing for this Court in *Morris v. State*, articulated what he called a "supplemental rule of interpretation": where the suppression court's fact-finding is ambiguous, incomplete, or nonexistent on a particular point, the appellate court does not treat that silence as rejection; rather, it fills that gap by crediting, from among the facts in the suppression record, the version of events most favorable to the prevailing party. 153 Md. App. 480, 489-90 (2003); *see also Turkes v. State*, 199 Md. App. 96, 113 (2011);

*State v. Funkhouser,* 140 Md. App. 696, 704 (2001); *Charity v. State*, 132 Md. App. 598, 606 (2000).

The Supreme Court of Maryland, presented with the question in *Grant*, declined to formally adopt the *Morris* framework, but left its status at this Court undisturbed.[1] The Supreme Court has never restricted this Court's application of the *Morris* rule. 449 Md. at 31 n.8; *see, e.g.*, *State v. Ofori*, 170 Md. App. 211, 216-18, *cert. denied*, 396 Md. 13 (2006) (where the suppression court "raced straight to its unadorned constitutional conclusion," this Court applied the supplemental rule and credited the State as prevailing party).[2]

Our cases also reflect the *Morris* principle without calling it the supplemental rule, and caution that the facts may not be in dispute and must be adequately shown in the record. *See Sutton v. FedFirst Fin. Corp.*, 226 Md. App. 46, 74 (2015) (stating that this Court may

---

[1] At oral argument, Hicks's counsel suggested that the Supreme Court rejected the supplemental rule in *Brown v. State*, 452 Md. 196 (2017). But the Supreme Court did not address the rule in *Brown* because the issue was moot. *Id.* at 208. There, the suppression court had failed to make *any* findings of fact about whether the defendant was in custody before receiving *Miranda* warnings, and the case turned on the admissibility of statements he made before receiving his *Miranda* rights. *Id.* at 200, 207-08. The Supreme Court remanded the case to the suppression court to make findings regarding whether the defendant was in custody during the relevant timeframe, *id.*, at 207-08, and then incorporated and considered the suppression court's supplemental findings of fact in its opinion. *Id.* at 203-08. In the instant case, there is no need to remand to the suppression court because the court did make a finding: the officers had reasonable suspicion to stop Hicks after observing the imprint of a handgun in his waistband.

[2] The Supreme Court of Maryland itself has affirmed on grounds broader than those relied upon by the courts below. For example, in *Thomas v. State*, the suppression court rested its custody finding solely "on the bases that Thomas was at the police station and that he later confessed." 429 Md. 246, 261 (2012). Rather than confine its analysis to those factors, the Supreme Court applied the totality-of-the-circumstances framework from *Whitfield v. State*, 287 Md. 124, 141 (1980), to affirm—notwithstanding the suppression court's failure to follow the same "formula." *Thomas*, 429 Md. at 259-62.

5

"affirm the circuit court's judgment 'on any ground adequately shown by the record, even one upon which the circuit court has not relied or one that the parties have not raised.'") (quoting *Monarc Constr., Inc. v. Aris Corp.*, 188 Md. App. 377, 385 (2009)); *Simpson v. State*, 121 Md. App. 263, 276 (1998) (citations omitted) ("Where, however, there is no dispute regarding the relevant facts, or if the trial court's resolution of an essential fact is implicit in its ruling, then no express findings are necessary."). *Grant* requires us to consider the full record; *Morris* tells us how to read it when the suppression court's findings are incomplete. Both principles apply here.

The majority contends that the State did not rely on the additional facts below and did not develop them as independent bases for the stop.[3] We acknowledge the point but reach a different conclusion. No case limits this Court to considering only the facts counsel raised in argument before the suppression court. And even treating consideration of the additional facts as a supplemental argument—rather than an independent basis for affirmance—our decisional law permits us to consider more detailed arguments than those previously offered by the parties. *See Est. of Brown v. Ward*, 261 Md. App. 385, 442-43 (2024); *Schiff v. State*, 254 Md. App. 509, 528 (2022) (citations omitted).

As noted, appellate courts have discretion to affirm on alternate grounds, and we would exercise that discretion here. In *State v. Bell*, the Supreme Court of Maryland

---

[3] Prior to closing arguments, defense counsel did not raise the argument that law enforcement's observation of a person openly carrying a handgun no longer establishes reasonable suspicion to support a *Terry* stop after *Bruen*. The State's focus on the gun imprint as a factual predicate to support the subject *Terry* stop, therefore, was not unreasonable. *See* Leahy, J. Concurring Opinion, at 15 n.14.

clarified that such discretion is not a mandate "that an appellate court must examine new, alternative grounds for upholding a trial court's decision"; rather, "it may do so if it deems such review appropriate." 334 Md. 178, 187-88 (1994) (citing *Robeson v. State*, 285 Md. 498, 501-04 (1979), *cert. denied*, 444 U.S. 1021 (1980)). We would deem it appropriate. The only limitation on that discretion arises when one party's failure to raise an argument below prejudices the other party. That concern is not present here, especially where the defense raised its *Bruen* argument after the State put on its case. *See Bell*, 334 Md. at 191 (declining to address the State's argument first raised on appeal because the omission was prejudicial to the defendant at trial).

In this case, the State was responding below and on appeal to Hicks's gun-plus-zero-factors argument to defeat his suppression motion under *Bruen*. Accordingly, this case is *not* a good vehicle to consider consequential issues involving the viability of Maryland's handgun licensing laws under this intersection of the Second and Fourth Amendments that Hicks proposes.[4] Even if the State and the suppression court did

---

[4] The historical development and practical operation of Maryland's handgun licensing regime make it even more difficult to determine whether Maryland has, in substance, regulated concealed carry, open carry, or a hybrid of the two. Historical sources trace the divergence between open-carry and concealed-carry regimes to nineteenth-century regulatory traditions. Early American jurisdictions generally tolerated the open wearing of arms—often associated with militia service and frontier norms—while treating concealed weapons as uniquely dangerous because they facilitated surprise attacks, dueling, and interpersonal violence. *See, e.g.*, *Bruen*, 597 U.S. at 47-48, 53-54 (identifying that prohibitions on concealed carry, but not on open carry, were common in the early United States); Saul Cornell, *The Persistence of Common Law Limits on Armed Travel in the Early Republic: Surety and Affray Laws in Historical Context*, 78 SMU L. REV. 343, 358 (2025); Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 20-27, 40 n.213

not rely on all the facts in the record, the facts are the facts—they remain part of the record and must be considered in our independent constitutional appraisal. Doing so allows us to resolve this case on narrower ground: whether the stop and frisk of Hicks was permissible under *Terry*, without reaching the broader constitutional questions Hicks urges upon us. *See* 392 U.S. at 21-22. Courts do not decide constitutional questions unnecessarily. *See*

---

(2012). Many Southern and Western states therefore adopted statutes permitting open carry while prohibiting concealed carry, but eventually permitted both forms of carry. Maryland initially followed this national norm, but then diverged. Beginning in the late nineteenth century, Maryland prohibited concealed carry but permitted open carry so long as the carrier did not do so with the intent to cause harm. 1886 Md. Laws ch. 375. But in 1972, Maryland adopted a licensing model that set it apart from the majority of states. Maryland conditioned public carry on individualized authorization. *See* 1972 Md. Laws ch. 13. Absent a clear legislative intent to the contrary, Maryland's regulatory agencies and courts have consistently interpreted the permit as authorizing only concealed carry, reflecting a longstanding legislative judgment that visible weapons in public pose heightened risks to public order and law-enforcement operations. *See McCloud v. Dep't of State Police, Handgun Permit Rev. Bd.*, 426 Md. 473, 476, 485 (2012); *Mackall v. State*, 283 Md. 100, 105-06 (1978) (referring to the permit regime as a concealed carry permit). This scheme is familiar to some of our sister states. *See, e.g.*, Brian Enright, *The Constitutional "*Terra Incognita*" of Concealed Carry Laws*, U. ILL. L. REV. 910, 926 (2015) (states such as Illinois and New York prohibit open carry but permit concealed carry). Thus, Maryland's handgun permitting regime, as interpreted by our regulatory agencies and courts, demonstrates a long-standing tradition of treating concealment as the required mode of civilian carry and views visible weapons—including printing—as inconsistent with the authorization granted by the handgun carry permit. The laws and regulations governing these permits, however, did not clearly distinguish between open and concealed carry. 1972 Md. Laws ch. 13, 42 ("Nothing in this section shall prevent the wearing, carrying, or transporting of a handgun by any person to whom a permit to wear, carry, or transport any such weapon has been issued under Section 36E."). That ambiguity has now been eliminated. In 2023, the General Assembly adopted PS § 5-307, which—effective October 1, 2023, too late to apply to Hicks—codified Maryland as a concealed-carry jurisdiction by requiring that any handgun carried under a permit be carried "in a concealed manner." This statutory clarification also materially reduces the stakes of resolving the constitutional question on Hicks's facts: because visible printing would now constitute improper carry, PS § 5-307(b)(1), the factual scenario presented in this case cannot recur under the current statute, diminishing any need for a constitutional holding directed at that now-superseded ambiguity.

*Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *Maryland State Bd. of Elections v. Ambridge*, 489 Md. 404, 456 (2025); *Sumpter v. Sumpter*, 436 Md. 74, 91-92 (2013) (citations omitted).

We, therefore, turn to the facts as the suppression record presents them—the facts the State did not develop below, but which were before the suppression court and thus are now before us.

### B. The Totality of the Circumstances: Handgun Plus Three Additional Facts

As we explained above, the *Morris* supplemental rule permits us to credit the version of the undisputed facts most favorable to the prevailing party. *Morris*, 153 Md. App. at 489-90. Our duty to make our own constitutional appraisal of the stop and frisk requires us to consider the totality of the circumstances in evidence, not merely the subset the suppression court expressly addressed or on which the State's argument focused. *See Grant*, 449 Md. at 14-15.

Applying that standard, the record contains three factors, each well-recognized by courts as potentially contributing to reasonable suspicion. Together with the officers' awareness of a recent homicide in the area, the handgun visible to ordinary observation, plus the three additional factors, establish reasonable suspicion under the totality of the circumstances. Those three factors are: (1) Hicks's movement away upon spotting the police vehicle; (2) his blading maneuver; and (3) the proximity of his hand to the firearm. The officers' awareness of a recent homicide in the area, while not a behavioral factor, provides relevant context for assessing the officers' observations. And critically, these observations occurred after the officers saw a handgun visible to ordinary observation.

9

**Walking away.** When Hicks saw the unmarked police vehicle, he turned and began walking away from the group.[5] We treat this factor with care. Courts have recognized that movement away upon noticing police may, in some circumstances, contribute to a reasonable suspicion analysis. *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000). But walking away is not flight, and it is not inherently suspicious. There are many reasons—entirely innocent, entirely understandable—why a person might choose to disengage from an encounter with an unmarked police vehicle. We do not rest heavily on this factor. We note it only because it is in the record, it is part of the totality, and—combined with everything else the officers observed—it must be part of the calculus.

**Blading.** As the police officers drove alongside Hicks, he bladed his body—turning sideways and crossing directly behind the unmarked vehicle. Detective Ramsey identified this in his testimony but did not elaborate on its significance. The State did not develop the point. Nevertheless, the blading appears momentarily through the side-view mirror of the police vehicle which was captured on the body-worn camera footage, and its significance is supplied by the objective record and the law rather than by the officer's explanation.

---

[5] The fact that the police vehicle was unmarked does not change our analysis. Although Hicks, had he been unaware that the unmarked vehicle was in fact a police vehicle, may have had no reason to walk away that would be indicative of criminal activity, a mere possibility of non-criminal activity does not negate his walking away as a factor. Indeed, the totality of the circumstances test assesses whether factors, which may appear non-criminal in isolation, combine to generate reasonable suspicion. *Illinois v. Wardlow*, 528 U.S.119, 125 (2000). Moreover, we cannot question what Hicks might have known. The *Terry* inquiry does not address the subjective beliefs of the person stopped. It begins and ends as an objective inquiry into the facts and circumstances known to the officer. *See Terry*, 392 U.S. at 21-22. The officers observed Hicks walk away from their unmarked vehicle, which, in combination with the other factors, aroused their reasonable suspicion.

Courts have recognized that blading—positioning or moving the body to conceal an object from police view—is a factor that may contribute to the reasonable suspicion calculus, particularly when observed by a trained officer in conjunction with other indicators of armed carry. *Booker v. State*, 267 Md. App. 315, 330 (2025) (citing *Reid v. State*, 428 Md. 289, 320 (2012) (Harrell, J., dissenting)) (discussing significance of "blading"). Detective Ramsey was a member of the Group Violence Unit. Whatever his testimony did not supply, the body-worn camera footage does.

**Hand proximity.** When Detective Ramsey approached, Hicks's right hand was in close proximity to the location of the handgun in his waistband. The U.S. Supreme Court has long recognized that a suspect's positioning of a hand near a suspected weapon is a factor bearing on reasonable suspicion. *See Adams v. Williams*, 407 U.S. 143, 148 (1972). Maryland courts have similarly treated hand proximity to a suspected weapon as an articulable fact supporting reasonable suspicion. *See Booker*, 267 Md. App. at 328; *In re Jeremy P.*, 197 Md. App. 1, 13-14 (2011). Detective Ramsey testified to this specifically, and the body-worn camera footage corroborates it. Hicks's other hand held a cellphone—leaving one hand unaccounted for and in the immediate vicinity of the firearm.

Considered in isolation, each of these factors is consistent with innocent behavior. A person may walk away from police without consciousness of guilt. A person may blade their body for any number of reasons. A person's hand may drift near their waist without a sinister purpose. *Terry* does not require that any single factor be dispositive, or that innocent explanations be ruled out before a stop may proceed. *Wardlow*, 528 U.S. at 125; *In re D.D.*, 479 Md. 206, 235 (2022). What *Terry* requires is that the police officer be able

11

to point to specific, articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. *Terry*, 392 U.S. at 21.

*   *   *

The majority holds that the stop was unlawful because the officers lacked reasonable suspicion. We disagree. The totality of the circumstances was more than sufficient.[6] The

---

[6] Courts have identified a wide range of factors that may contribute to reasonable articulable suspicion under the totality of the circumstances, each of which describes conduct that is independently lawful. Physical indicators include a bulge in clothing consistent with a weapon, *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977); concealment of an object in a pocket or waistband, *United States v. Dameron*, 103 F.4th 467, 468-69 (7th Cir. 2024); unnatural hand postures suggesting a reflexive adjustment of an object, *United States v. Weaver*, 9 F.4th 129, 147 (2d Cir. 2021); and hand postures inside a pocket suggesting that an object was "cupped," *United States v. Black*, 525 F.3d 359, 365 (4th Cir. 2008). Behavioral indicators include unprovoked flight upon seeing police, *Wardlow*, 528 U.S. at 124; nervous or evasive conduct, *id.*; "blading" or turning the body to shield an object from view, *Booker*, 267 Md. App. at 320, 330; walking away from a group or changing direction upon noticing police, *United States v. McKinney*, 980 F.3d 485, 495 (5th Cir. 2020); reaching toward or keeping a hand near a waistband, *In re Jeremy P.*, 197 Md. App. at 18-19; bending unnaturally to reach into an open bag large enough to contain a weapon, *McDowell v. State*, 407 Md. 327, 338 (2009); the "target glance," characterized by a quick look at an area containing contraband or weapons, *United States v. Pavao*, 134 F.4th 649, 652 (1st Cir. 2025); "mechanical" or forced civility, such as unnatural waving or forced friendliness, *United States v. Arvizu*, 534 U.S. 266, 276 (2002); repetitive pacing on a sidewalk, *Terry*, 392 U.S. at 6, 28; prolonged staring into a store window, *id.*; vague or contradictory travel narratives, *United States v. Mason*, 628 F.3d 123, 129 (4th Cir. 2010); and appearing to be out of place or wearing attire inappropriate to the weather, *United States v. Scott*, 816 F. App'x 732, 737 (3d Cir. 2020). Tipster information includes a reliable tip that a person is carrying a gun, *Quince v. State*, 319 Md. 430, 436 (1990); an anonymous 911 call with sufficient corroboration, *Navarette v. California*, 572 U.S. 393, 398 (2014); a wanted flyer issued on reasonable suspicion, *United States v. Hensley*, 469 U.S. 221, 232 (1985); and resemblance to a recent crime suspect, *Cartnail v. State*, 359 Md. 272, 297-94 (2000). Contextual factors include presence in a known high-crime area, *Wardlow*, 528 U.S. at 124; presence at a location known for drug trafficking, *Allen v. State*, 85 Md. App. 657, 667-68 (1991); time of day, particularly late night or early morning hours, *Cartnail*, 359 Md. at 295-96; proximity to a recently reported crime scene, *Stokes v. State*, 362 Md. 407, 417 (2001); and prior criminal history or active supervision status

12

police officers saw a visible handgun, a person who walked away upon eye contact with the unmarked police vehicle, bladed his body as they drew close, and held his free hand near the firearm—all against the backdrop of their awareness of a recent homicide in the area. In our view, the officers had reasonable suspicion to stop Hicks.

Section II addresses a separate and independent disagreement: even accepting the majority's premise that the gun is the only permissible consideration, we disagree with the majority's constitutional analysis.

## II.

Even if we agreed with the majority that the handgun is the only factor that we can consider here for the stop, we disagree with the majority's holding that the stop was unconstitutional. The majority holds that the stop that produced the contraband at issue was unconstitutional in light of *Bruen* because Hicks was carrying a handgun pursuant to a valid permit. We disagree, because the language in *Bruen* on which the majority relies is *dicta*, and *Terry* remains binding law that we are not free to disregard.

---

known to the police officer, *United States v. Holmes*, 376 F.3d 270, 277-78 (4th Cir. 2004). Police officer experience and training—including familiarity with the neighborhood and recognition of conduct consistent with known criminal patterns—independently contribute to the calculus. *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989); *United States v. Cortez*, 449 U.S. 411, 418 (1981). Each of these factors describes conduct that is entirely lawful in isolation. Every factor on this list is not merely lawful—it is necessarily lawful. If any of these acts were themselves criminal, there would be no need for a *Terry* stop—the police officer would have probable cause to arrest. The reasonable suspicion inquiry exists precisely because the conduct observed is lawful but suspicious. That is the situation here. If gun possession is to be distinguished from the factors on this list, the distinction cuts the wrong way for the majority: a handgun is the one item on this list that is designed for lethality and capable of being turned to that purpose in an instant. That characteristic is precisely what *Terry*'s frisk authority was designed to address. It is a reason for more deference to the police officer's safety judgment, not less.

13

*Bruen*'s holding is narrow, though its consequences were not. The U.S. Supreme Court struck down New York's proper-cause requirement for public handgun carry licenses, concluding that the Second Amendment protects the right of law-abiding citizens to carry a handgun outside the home for self-defense. *Bruen*, 597 U.S. at 9-11. The reach of that holding was immediate and significant—Maryland's own permit statute, which imposed a similar showing-of-need requirement, fell along with New York's as a direct consequence. The General Assembly subsequently replaced the permit statute with one that did not demand the applicant's assertion of a special need.[7] 2023 Md. Laws Ch. 651. *Bruen*'s holding thus did substantial work without this Court holding that it alters Fourth Amendment jurisprudence. The broader language about the nature and scope of public handgun carry rights—the language the majority now treats as restructuring Fourth Amendment stop-and-frisk doctrine—was not necessary to accomplish any of that. It is *dicta*. We are bound by the Supreme Court's holdings. We are not bound by its *dicta*, and we should be especially reluctant to treat *dicta* as controlling when doing so requires us to override an established doctrine like *Terry* that the Supreme Court itself has never questioned.

*Bruen* was written with considerable rhetorical ambition, repeatedly invoking the image of the law-abiding citizen exercising a fundamental right and deploying expansive language about the scope of the right to public handgun carrying that went well beyond

---

[7] The statutory amendments to Maryland's wear and carry permit regime did not take effect until October 1, 2023. Hicks was arrested in July 2023. This temporal gap is irrelevant because, as we discuss *infra,* Maryland abandoned the substantial need requirement in its permitting scheme in 2022, immediately following *Bruen*.

14

what the New York licensing question required. Justice Kavanaugh's concurrence, joined by Chief Justice Roberts, was necessary to the majority and cautioned against overbroad readings of *Bruen*—writing that licensing regulations, like the one police enforced when they stopped Hicks, remain enforceable. *See Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring).

The U.S. Supreme Court's subsequent decision in *United States v. Rahimi*, 602 U.S. 680 (2024), echoed Justice Kavanaugh's caution and reflected a measured pulling back from some of the exuberance in *Bruen*'s majority opinion. *Rahimi* clarified that the *Bruen* test was not meant to trap the law "in amber," softened the historical analogy requirement from "distinctly similar" to "relevantly similar," and stepped back from the "responsible citizen" framing that *Bruen* had employed freely—acknowledging that the term had not been carefully defined and did not do the constitutional work that *Bruen* had suggested. *Rahimi*, 602 U.S. at 691-92. Eight of nine Justices joined *Rahimi*, a breadth of agreement that suggests *Bruen*'s most expansive readings—readings which Justice Kavanaugh's concurrence had already cautioned against—had not commanded a durable majority even within the Court that decided it. The Supreme Court of Maryland reached a similar conclusion in *Fooks v. State*, 490 Md. 458 (2025), which described *Rahimi* as having "refocused" the *Bruen* test on principles rather than on the search for specific historical analogues. *Fooks,* 490 Md. at 487 n.12. That the majority here reaches for *Bruen*'s most expansive language—language that *Rahimi* itself moderated—to override a fifty-year-old Fourth Amendment holding is reason enough for caution.

15

That *Bruen*'s holding is narrow has not been a controversial proposition in this State. The Supreme Court of Maryland recently examined *Bruen*'s scope in *Fooks*, and characterized *Bruen*'s own assurances about shall-issue licensing regimes as *dicta*—language that was not necessary to the Court's disposition of the New York licensing question before it. *Fooks*, 490 Md. at 493. What was true of *Bruen*'s assurances about licensing is equally true of its broader language about the right to public carrying of a handgun. As Justice Biran observed in dissent in *Fooks*, "a formula repeated in dictum but never the basis for judgment is not owed stare decisis weight." *Id.* at 550 (Biran, J., dissenting) (quoting *Gonzalez v. United States*, 553 U.S. 242, 256 (2008) (Scalia, J., concurring)).

At bottom, *Bruen* is a case about handgun permit laws, not about the Fourth Amendment. The Supreme Court in *Bruen* never mentioned the issue presented here. Its holding addressed whether New York could condition the issuance of handgun carry permits on a showing of special need for self-defense. *Bruen*, 597 U.S. at 9. It said nothing about whether the Fourth Amendment permits a *Terry* stop of a person observed carrying a handgun. In this Fourth Amendment case, *Bruen* compels nothing.

Most critically, the General Assembly agrees with our view. After *Bruen*, the General Assembly received advice from the Attorney General on *Bruen*'s limited reach and acted as if the rest of the licensing scheme remains in force.

To situate the State's post-*Bruen* actions, we begin with the statutory architecture that existed before *Bruen* and continues to exist today. Maryland has, for decades, employed a stable two-part structure: a general prohibition on carrying handguns in public,

16

and a permitting system that creates narrow exceptions to that prohibition. That framework is the backdrop against which the General Assembly, the Governor, and the Attorney General evaluated *Bruen* and determined what the decision required—and what it did not.

The scheme is constructed as follows. Maryland's criminal law establishes a general prohibition on wearing, carrying, or transporting a handgun. MD. CODE, CRIMINAL LAW ("CR") § 4-203 ("a person may not wear, carry, or transport a handgun, whether concealed or open, on or about the person"). The statute then enumerates exceptions—one of which is possession of a valid wear-and-carry permit. CR § 4-203(b). A separate provision enables police to conduct *Terry*-style stop-and-frisks to ensure compliance with the permit requirement. CR § 4-206. Possession of a handgun permit does not confer a right to carry; it excepts the permit holder from the general prohibition.

The General Assembly codified an express statement of its legislative intent in CR § 4-202:

The General Assembly finds that:

(1)    the number of violent crimes committed in the State has increased alarmingly in recent years;

(2)    a high percentage of violent crimes committed in the State involves the use of handguns;

(3)    the result is a substantial increase in the number of deaths and injuries largely traceable to the carrying of handguns in public places by criminals;

(4)    current law has not been effective in curbing the more frequent use of handguns in committing crime; and

17

(5)     additional regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of the public.[8]

We are bound by the unambiguous, codified findings of the General Assembly: this permit scheme is necessary to protect the public from the "alarming," deadly threat posed by handguns.[9]

The permit scheme is set out in Title 5, Subtitle 3 of the Public Safety Article. To obtain a permit, an applicant applies to the State Police (PS § 5-304) and must satisfy statutory eligibility and training requirements (PS § 5-306). Historically, one of those requirements was that the applicant demonstrate a "good and substantial reason" to carry a handgun—defined to include a finding that the permit was "necessary as a reasonable precaution against apprehended danger." 2013 Md. Laws Ch. 427, PS § 5-306(a)(6)(ii) (repealed 2023); 2003 Md. Laws Ch. 5, PS § 5-306(a)(5)(ii) (amended 2013); 1972 Md. Laws Ch. 13, Art. 27 § 36E(a)(6) (repealed 2003). That requirement gave the State Police

---

[8] This kind of statute, "a rarely used express statement of legislative intent," is enacted "to underscore the importance" of the law and serves as the clearest possible instruction from the legislature to courts on how to implement it. *Wash. Gas Light Co. v. Md. Pub. Serv. Comm'n*, 460 Md. 667, 671 (2018) (holding that the General Assembly's codified intent must be considered in construing the statute).

[9] The General Assembly's findings remain current. Maryland had the 11th highest gun homicide rate in the country in 2023, with 39% of all gun homicides concentrated in Baltimore City alone. Baltimore also experiences hundreds of nonfatal shootings each year, reflecting a broader pattern of firearm violence beyond fatal incidents. CTR. FOR GUN VIOLENCE SOLUTIONS, JOHNS HOPKINS BLOOMBERG SCH. OF PUB. HEALTH, *State Gun Violence Data: Maryland* (2023), https://perma.cc/48YX-N5CL; MD. DEP'T OF HEALTH, *Firearm Violence Data Dashboard* (2025), https://perma.cc/6DDX-4RWU. If it is a relevant consideration after *Bruen*, the State of Maryland has an interest in combatting handgun violence to protect the public.

broad discretion to deny permits to applicants who could not articulate a particularized need beyond the general desire for self-defense shared by the public at large, and it functioned in practice to confine permits to certain classes: security professionals, persons who could document specific threats, and the like. *Woollard v. Gallagher*, 712 F.3d 865, 879 (4th Cir. 2013) (affirming constitutionality of Maryland's good-and-substantial-reason permit scheme before *Bruen*).

The *Bruen* decision invalidated the kind of discretionary "good cause" requirement found in PS § 5-306 as inconsistent with the Second Amendment. *Bruen*, 597 U.S. at 32. Maryland's response was immediate. Governor Larry Hogan directed the State Police to suspend enforcement of the good-and-substantial-reason requirement. The Office of the Attorney General then issued an advice letter to the State Police's Licensing Division confirming that the good-and-substantial-reason requirement was "now clearly unconstitutional" and that the Department "may not continue to enforce" it. Letter from Patrick B. Hughes, Chief Counsel, Opinions & Advice, Office of the Attorney General, to Captain Andrew J. Rossignol, Commander, Licensing Division, Maryland Department of State Police 1 (July 6, 2022) ("July 6 Letter") [attached as the Appendix to this opinion].

The July 6 Letter was equally clear, however, about what *Bruen* did not disturb. The letter stated that "it remains illegal for an individual to carry, wear, or transport a handgun in public in Maryland without a permit," citing CR § 4-203 directly. *Id.* at 2. In a footnote, the letter advised that "*Bruen* does not seem to impose any blanket prohibition on the criminal prosecution of individuals who carry handguns without a permit." *Id*. at 5 n.2. On severability, the letter concluded that the unconstitutional requirement could be severed

19

from the remainder of the statute and that the General Assembly would not have intended the permit scheme to fall with it. *Id*. at 5.

When the General Assembly acted in 2023, it did so against the backdrop of this legal advice.[10] By deleting the good-and-substantial-reason requirement from PS § 5-306 and substituting a set of objective disqualifiers, House Bill 824 converted Maryland to a shall-issue regime in which the Secretary must issue a permit to any applicant who satisfies the statutory criteria. In the same enactment, the legislature amended CR § 4-203 directly, increasing the maximum penalty for a first-offense violation from three to five years' imprisonment. *See* 2023 Md. Laws Ch. 651 (HB 824); CR § 4-203(c)(2)(i).[11] Amending the criminal prohibition and reenacting the permit requirement in the same bill—while removing only the unconstitutional clause—reflects a legislative judgment that the underlying prohibition remained valid and operative.[12] Before Governor Wes Moore

---

[10] The judiciary had little occasion to weigh in during this period. The only reported appellate decision was a narrow administrative appeal in which the Appellate Court of Maryland applied *Bruen* to a permit-denial case and held only that the "good and substantial reason" clause could no longer be enforced, without addressing CR § 4-203 or the broader statutory framework. *Matter of Rounds*, 255 Md. App. 205, 212 (2022).

[11] The legislative history of HB 824 and SB 1 of the 2023 session are not part of the record in this case, but that does not preclude us from addressing it. *First*, legislative histories are not adjudicative facts and are always subject to appellate analysis. *Second*, it is not our fault that the constitutionality of existing Maryland law was not briefed.

[12] Maryland law affords duly enacted statutes a strong presumption of constitutionality, grounded in separation-of-powers principles and the judiciary's respect for the coordinate branches. *See, e.g.*, *Spiegel v. Bd. of Educ. of Howard Cty.*, 480 Md. 631, 645 (2022) ("The separation of legislative, executive, and judicial powers across the three government branches is guaranteed under Article 8 of the Declaration of Rights. Thus, the statues enacted by the General Assembly are presumed to be constitutionally valid.") (cleaned up); *Koshko v. Haining*, 398 Md. 404, 426 (2007). A challenger must rebut that

20

signed the bill into law, Attorney General Anthony Brown advised him that HB 824 was "legally sufficient and is not clearly unconstitutional" and that it "sets forth objective standards and imposes minimal administrative burdens" consistent with *Bruen* and the historical tradition of firearms regulation. Letter from Anthony G. Brown, Attorney General, to Governor Wes Moore (May 5, 2023), https://perma.cc/K3BZ-4LZE.[13]

The upshot is that Maryland's post-*Bruen* regime reflects a deliberate legislative judgment at every step. The General Assembly eliminated what the Constitution required it to eliminate, retained and reenacted the permit requirement, amended and strengthened

---

presumption beyond a reasonable doubt. *See Mahai v. State*, 474 Md. 648, 664 (2021); *Edgewood Nursing Home v. Maxwell*, 282 Md. 422, 427 (1978) (citations omitted). Under Maryland's reenactment rule, when the General Assembly repeals and reenacts a statutory provision without material change, it is presumed to adopt existing judicial constructions of that provision. *See Williams v. State*, 292 Md. 201, 210 (1981) (reenactment without material change signals legislative adoption of prior judicial interpretation); *Harbor Island Marina, Inc. v. Bd. of Cty. Comm'rs of Calvert Cty.*, 286 Md. 303, 322 (1979); *Harden v. Mass Transit Admin.*, 277 Md. 399, 406-07 (1976) ("The General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute."). The General Assembly's 2023 repeal and reenactment of CR § 4-203 through HB 824 reinforces the presumption of constitutionality, as it revisited this statute with full awareness of the constitutional landscape and still specifically chose to reenact it.

[13] During the same session, the General Assembly substantially expanded the locations in which even permit holders are prohibited from carrying handguns. 2023 Md. Laws Ch. 680 (SB 1); PS § 5-307. Senate Bill 1—enacted as the "Gun Safety Act of 2023"—designated a broad range of "sensitive places" where public carry is prohibited regardless of permit status, including schools, government buildings, healthcare facilities, public transit, and other high-risk public venues. The Act also adopted a default rule prohibiting carry on private property without the owner's express consent and added new disqualifiers. In the same session, the General Assembly enacted HB 824, 2023 Md. Laws Ch. 651, which strengthened Maryland's training, background-check, and renewal requirements for permit holders. Taken together, SB 1 and HB 824 reflect the General Assembly's continuing effort to regulate the public carrying of firearms to the full extent permitted by the Second Amendment as interpreted by the U.S. Supreme Court.

the general prohibition, and did so with legal advice in hand opining that the prohibition remained constitutionally sound. The Attorney General, the General Assembly, and the Governor all proceeded on the same understanding: that *Bruen* changed the standard for issuance of a permit and nothing more. It did not disturb the prohibition on carrying a handgun without a permit. It did not render CR § 4-203 unconstitutional. Nor did it alter the corresponding Fourth Amendment consequences. The prohibition on carrying a handgun without a permit authorizes a *Terry* stop to investigate permit status. *See* Leahy, J. Concurring Opinion at 7-10. Once a handgun is confirmed or reasonably suspected, a protective frisk follows.

We must uphold the stops that *Terry* authorizes because, unlike *Bruen*, *Terry* is not *dicta*. It is a holding of the U.S. Supreme Court, reaffirmed repeatedly over more than five decades, and it remains good law. Nothing in *Bruen* purports to overrule it. The majority relies on *United States v. Wilson*, 143 F.4th 647 (5th Cir. 2025), but *Wilson* is not binding here, and we do not find it persuasive. The Fifth Circuit in *Wilson* did exactly what an intermediate appellate court should not do—it treated *Bruen dicta* as having restructured the *Terry* doctrine on its own authority. *See* 143 F.4th at 659. We are no more free to do that than the Fifth Circuit was, and the methodology is unsound regardless of the result it produces. The Seventh Circuit recently confronted similar facts and wisely declined to resolve what it called the "sure-to-come challenging questions about how Second Amendment standards after *Heller* and *Bruen* interact with applications of *Terry*," leaving that question for the U.S. Supreme Court. *United States v. Dameron*, 103 F.4th 467, 469

22

(7th Cir. 2024). In our view, that is the correct approach for an intermediate court and it is the approach we would take here.

We address those grounds in the alternative. Even if *Bruen*'s broader language were controlling—a proposition we reject—the stop and frisk was independently justified on two grounds that *Bruen* itself does not disturb.

## III.

Even if *Bruen*'s broader language has the force the majority attributes to it, the stop and frisk was justified on two independent grounds. *First*, existing Fourth Amendment doctrine—grounded in police officer safety and the realities of Maryland's permit verification regime—authorized the frisk regardless of what *Bruen* says about the right to carry handguns. *Second*, possession of a concealed handgun in Maryland provides reasonable articulable suspicion of illegal activity even after *Bruen*, because Maryland's statutory framework treats unlicensed carry of a handgun as a crime and the permit as an affirmative defense.

### A. Police Officer Safety and Permit Verification

*Terry* grounds law enforcement's frisk authority explicitly in police officer safety. When a police officer has reason to believe that a person with whom the officer is dealing is armed and dangerous, the police officer may conduct a carefully limited search for weapons. *Terry*, 392 U.S. at 27. That interest is weighty enough to justify protective measures independent of any suspicion of criminal activity. *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977). Critically, the frisk prong of *Terry* requires only that the police officer reasonably suspect the person is armed and dangerous—it does not require that the

23

police officer independently suspect criminal activity separate from the possession itself. *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009). A person known to be carrying a handgun—whether because the outline of the weapon is visible through his clothing or because he has voluntarily disclosed that he is armed—is armed. The dangerous prong requires a practical, common-sense judgment about the risks of the encounter, not a legal conclusion about the lawfulness of the handgun carrying. The Second Amendment does not bear on that judgment. Whether a person has a constitutional right to carry a handgun says nothing about whether a police officer faces a safety risk during the brief interval required to verify the permit.[14]

Maryland's regulatory context reinforces this conclusion. As we explained above, *see supra* Section II, every person carrying a handgun in public in Maryland is either carrying the handgun with a valid permit or committing a crime. CR § 4-203; PS § 5-306. When a police officer observes what appears to be a weapon through a person's clothing in Maryland, the immediate regulatory question is not whether the person has a right to carry a handgun in the abstract—it is whether the person has a currently valid permit. That question cannot be resolved without a brief stop.[15]

---

[14] Of course, as we state in the Conclusion, the facts of this particular case presented a stop that was not brief and a frisk that was excessive in scope.

[15] The majority's reliance on *Bruen* to restructure the *Terry* doctrine is particularly difficult to sustain in light of Maryland's own history and tradition of handgun regulation. Whatever weight *Bruen*'s broader language about peaceable public handgun carrying might carry as a general matter, that language does not operate in a historical vacuum in this State. Maryland's four state constitutions have never recognized an individual right to keep and bear arms—a conscious choice, not an oversight. At the 1867 constitutional

The majority contends that a brief stop to verify compliance with the gun licensure statute is nonetheless impermissible because it lacks the requisite suspicion. In support, the majority cites *Delaware v. Prouse*, 440 U.S. 648 (1979), which held that police officers may not conduct suspicionless stops to verify licensing compliance "except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed … or that … an occupant is otherwise subject to seizure for violation of law." *Prouse*, 440 U.S. at 663; Majority Opinion at 31, 38 (citing *Prouse*, 440 U.S. at 663). The majority's reliance on *Prouse* is misplaced. The exception in *Prouse* is precisely this case, where carry always indicates a violation of law. *See infra* Section III B. A Maryland police officer who observes a handgun printing through clothing therefore has reasonable

---

convention, held contemporaneously with ratification of the Fourteenth Amendment that *Bruen* treats as a key interpretive reference point, delegates expressly considered and rejected a proposal to insert such a right into the Maryland Constitution. *See* DEBATES OF THE MARYLAND CONSTITUTIONAL CONVENTION OF 1867 150-51 (Philip B. Perlman ed., Hepbron & Haydon 1923). The delegate who spoke most forcefully against the proposal— George William Brown, a former Mayor of Baltimore who had himself been arrested and detained without trial by federal troops—argued that "it is a presumption of evil intent to go about armed" and expressed confidence that the matter was better "[left] in the power of the Legislature of Maryland, representing the people of Maryland, to prescribe such regulations as they may deem proper." *See* John J. Connolly, *Maryland's Historical Firearms Restrictions and What They Mean After* Heller, McDonald, *and* Bruen 7-8 (2023), https://ssrn.com/abstract=4319843. Maryland thereafter enacted its first broad concealed-carry restriction in 1870, just after Fourteenth Amendment ratification, and extended it statewide in 1886. *Id.* at 19-20. This history does not, of course, exempt Maryland from the holding of *Bruen*—as Connolly himself acknowledges, federal constitutional rights do not apply differently in different states. *Id.* at 10. But it does illuminate why, in the absence of controlling U.S. Supreme Court authority extending *Bruen* to the Fourth Amendment doctrine, Maryland courts should not be quick to treat *Bruen*'s broader *dicta* as having displaced a regulatory tradition this State has maintained since before the Fourteenth Amendment was ratified.

suspicion that the person is violating CR § 4-206. *Prouse* does not prohibit the stop. It authorizes it.

Maryland's General Assembly has spoken directly to the stop that is authorized here. *See* Leahy, J. Concurring Opinion at 3-5. Section 4-206 of the Criminal Law Article authorizes a police officer to both stop and conduct a limited frisk of a person when the police officer "reasonably believes that" the person "may be wearing, carrying, or transporting a handgun" and that "because the person possesses a handgun, the person is or presently may be dangerous to the officer or to others." CR § 4-206(a)(1)(i)-(ii). The statute further authorizes the police officer to "ask any question and request any explanation that may be reasonably calculated to determine whether the person is unlawfully wearing, carrying, or transporting a handgun." CR § 4-206(a)(2)(iv). And upon discovering a handgun, the police officer may "demand evidence from the person of the person's authority to wear, carry, or transport the handgun." CR § 4-206(b)(1). If the person does not produce that evidence, the police officer has statutory authority to seize the handgun and arrest. CR § 4-206(b)(2). The General Assembly, thus, contemplated two things: that police officers have the right to demand proof of a permit, and that they have the right to be safe while they ascertain the permit's existence and validity. The majority's rule, whatever its merits as a matter of Second Amendment doctrine, disables the field enforcement mechanism that the Maryland General Assembly specifically provided.[16]

---

[16] This Court has described CR § 4-206 as a legislative codification of the *Terry* standard for handgun encounters. *Allen*, 85 Md. App. at 670-71. The remedies available for a violation of the statute do not include exclusion of evidence. *Id.* at 673. We cannot

26

Maryland's permit statute makes the verification need concrete. The statute requires that a permit holder carry the permit at all times when carrying a handgun, provides for revocation of the permit upon disqualification, makes it a crime to fail to return a revoked permit, and mandates ongoing regulatory review of permit holders to determine whether they continue to meet the qualifications for carry. PS §§ 5-308, 5-309, 5-310, 5-313. A permit is not a permanent certification of law-abiding status. It is a revocable license subject to ongoing conditions. *Bruen* itself approved shall-issue licensing regimes precisely because they are designed to ensure that those bearing arms in the jurisdiction are, in fact, law-abiding responsible citizens. *Bruen*, 597 U.S. at 38 n.9. A licensing regime is only meaningful if it can be enforced. Field verification of a permit is the minimum enforcement mechanism without which the statutory regime that *Bruen* blessed becomes unenforceable in practice.

Enforcement of the licensing regime requires police officers to stand in harm's way while they dispel legitimate concerns that a handgun carrier is violating the licensing requirements. A permit certifies only that its holder satisfied the applicable licensing criteria *at the time of issuance*. It does not establish that the permit holder has remained

---

disregard this statute simply because of its remedial limitation. *See Antonio v. SSA Sec., Inc.*, 442 Md. 67, 79 n.12 (2015) ("codification … is not a meaningless legislative activity"); *DeBusk v. Johns Hopkins Hosp.*, 342 Md. 432, 445 (1996) ("one of our cardinal rules of statutory construction is not to find any word, clause, sentence, or phrase (nor, we might add, statutory subsection) superfluous, meaningless, or nugatory"). The question is not whether CR § 4-206 independently requires suppression—it does not—but whether the legislative judgment it embodies informs the Fourth Amendment reasonableness inquiry. It does.

law-abiding since. It does not confirm that the permit is still valid, that it has not been revoked, that no felony conviction has intervened, that no disqualifying restraining order has been entered, that it matches the handgun in the holder's possession, or that the permit is genuine rather than fraudulent. The police officer on the street has no means of verifying any of these things instantaneously. The existence of a licensing regime does not eliminate the police officer's legitimate safety interest during the time it takes to verify compliance with that regime.

Even after *Bruen*, a *Terry* frisk remains permissible to protect police officer safety during the time reasonably necessary to verify the permit.[17]

## B.      Presumptive Unlawfulness

The *Terry* stop was independently justified on a second ground. Possession of a concealed handgun alone continues to provide reasonable articulable suspicion of illegal activity in Maryland. To evaluate a *Terry* stop, Maryland courts ask whether a police officer has identified specific facts which, when considered with the rational inferences that may be drawn from those facts under the totality of the circumstances, raise a reasonable suspicion that a particular individual may be engaged in wrongdoing. *State v. Stone*, 493 Md. 78, 101-02 (2026). Maryland courts have long held that concealed handgun possession creates reasonable suspicion of illegal activity. *See, e.g., Quince v. State*, 319 Md. 430, 434 (1990) (upholding *Terry* stop based only on reliable tip that a person was

---

[17] Although the frisk here was authorized, its scope exceeded that authority. *See infra* Conclusion.

28

carrying a gun). The holding of the Supreme Court of Maryland in *Quince* remains a mandatory precedent that we, as an intermediate court, are duty-bound to follow. *Quince* rested on a straightforward statutory foundation: Maryland law presumptively prohibits wearing, carrying, or transporting a handgun, CR § 4-203(a)(1), and a concealed handgun carrying permit functions as an affirmative defense to that prohibition, CR § 4-203(b)(2). *Id.* at 437. Because handgun carrying is presumptively unlawful, a police officer who observes a person carrying a concealed handgun has reasonable suspicion that a crime is being committed.

The majority holds that *Bruen* has reversed this presumption, such that handgun carrying is now presumptively lawful and cannot alone support a stop. The majority may be correct. But *Bruen* did not hold that Maryland's handgun prohibition, CR § 4-203(a)(1), was unconstitutional. That presumption—enacted by the General Assembly, reaffirmed by subsequent caselaw, and, notably, unchallenged by Hicks—remains Maryland law that we must apply.[18] The Supreme Court of Maryland reaffirmed the structure of CR § 4-203 mere weeks ago:

> [W]e conclude that the exceptions in CR § 4-203(b)(2), (6), and (7) function as carve-outs from the general prohibition against the carry of

---

[18] The majority cites four pre-*Bruen* circuit court decisions for the proposition that, prior to *Bruen*, in states where handgun carrying is presumptively illegal, possession alone is sufficient for a *Terry* stop. *See United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010); *United States v. Pope*, 910 F.3d 413, 416 (8th Cir. 2018); *United States v. Rodriguez*, 739 F.3d 481, 488 (10th Cir. 2013); *United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012). The majority, however, argues that, because *Bruen* flipped the presumption, these cases are no longer authoritative. But if we are correct that the language of *Bruen* upon which the majority relies is *dicta*, *see supra* Section II, these cases remain persuasive authority that handgun carrying alone still provides reasonable suspicion for a *Terry* stop.

handguns in § 4-203(a). First, that conclusion best fits the plain language of § 4-203(b), which does not provide the holders of carry permits with an affirmative right, but instead states only what "[t]his section does not prohibit." Second, that conclusion also best matches the structure of the statutory scheme, which identifies a broad prohibition and several specific exceptions.

*Engage Armament LLC v. Montgomery County*, __ Md. __, No. 9, Sept. Term 2025, Slip Opinion at 22-23 (April 28, 2026) (holding that, because CR § 4-203(b) only provides narrow exceptions to the prohibition on handgun carrying rather than a right to carry, the statute does not preempt a county prohibition on ghost guns near public places). The Supreme Court of Maryland made it clear that handgun carrying remains generally unlawful in Maryland, and a wear and carry permit provides a narrow exception under CR § 4-203(b)(2). The general prohibition on handgun carrying entitles officers to presume that any person carrying a handgun is violating the law. *Engage Armament* thus maintains the statutory foundation that decided *Quince*: that handgun carrying is presumptively unlawful and a permit provides an affirmative defense. We disagree with the majority that, as an intermediate court, we can overturn the long-standing structure of CR § 4-203 that *Engage Armament* reaffirms. Until the Supreme Court of Maryland holds otherwise, our analysis is governed by *Quince*. Handgun possession remains presumptively unlawful under Maryland law. The police officers' observation of that presumptively illegal activity created reasonable suspicion that illegal activity was occurring. Accordingly, the *Terry* stop was permissible.[19]

---

[19] In addition, we disagree with the majority's premise that Hicks is entitled to claim the presumptive protection of the Second Amendment. *Bruen* extended Second

30

The majority's contrary holding stretches us far beyond the confines of reasonable suspicion. The majority's premise—that because carrying a handgun is lawful, it thus cannot establish reasonable suspicion—proves too much. Every factor courts have recognized as contributing to reasonable articulable suspicion describes conduct that is, standing alone, entirely lawful. It is legal to be nervous. It is legal to turn away from police. It is legal to walk away from a group. It is legal to keep a hand near one's waistband. It is legal to be out late at night. It is legal to stand in a high-crime neighborhood. It is legal to wear a fanny pack. It is legal to pay cash. It is legal to pace on a sidewalk. It is legal to look into a store window. None of these things, by itself, establishes reasonable suspicion of criminal activity. All of them, filtered through the experience of a police officer's

Amendment protection to "law-abiding, responsible citizens." *Bruen*, 597 U.S. at 26 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) ("The Second Amendment … 'elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense.'")). In *Rahimi*, the Court clarified that this language describes the unquestioned core of the right—not an exhaustive definition of its reach— and declined to hold that someone could be disarmed simply for being labeled "irresponsible." *Rahimi*, 602 U.S. at 700-01. But the Court was equally clear that the term was not without content: it was not disavowed, and it continues to do work. In *Fooks*, the Maryland Supreme Court acknowledged this, and Justice Watts, concurring, drew on it directly—concluding that a person whose possession of firearms was itself unlawful conduct could not claim the presumptive protection the right affords. *Fooks*, 490 Md. at 517-18 (Watts, J., concurring). We cannot disregard that essential limitation: the presumption does not apply to a person committing a crime. The majority treats the act of carrying a handgun as proof of the law-abiding status that Hicks must have attained to be entitled to the presumption. The majority's conclusion skips the very step that *Bruen* presupposes. That is, whether a person is law-abiding is not answered by *Bruen*—it is precisely the question that a brief, permit-verifying stop is designed to answer. Until the police officer verifies that the person is carrying their handgun in compliance with the licensing regime, the person is not entitled to the presumptive protection of *Bruen*.

31

knowledge and training, may.[20] Police officers may, based on their knowledge and training, suspect that presumptively unlawful handgun carrying is indicative of criminal activity.

## Conclusion

We write separately because the majority's constitutional ruling is unnecessary to the disposition and carries consequences far beyond this case. We concur in the majority's holding that Detective Rodriguez exceeded the permissible scope of the *Terry* frisk, and that the evidence obtained must be suppressed. That conclusion is unanimous, and it is sufficient to resolve this appeal. Our colleagues conclude that the stop was unlawful and that the officers were not entitled to secure the weapon and confirm the validity of the permit, but those conclusions are unnecessary to the disposition. We would not reach those questions here, because all of us agree on this: whatever the police were entitled to do, they were not entitled to rummage through Hicks's pockets and his satchel. A *Terry* frisk is a carefully limited intrusion to ensure officer safety, check for weapons, and, in this case, ascertain the permit status. It is not a search. Here, the officers reached directly into an unzipped satchel before any pat-down could have revealed a weapon, pulled open Hicks's pants pocket to look inside, and removed contraband without any testimony that its incriminating character was immediately apparent. The officer who conducted the pat-down did not testify, and the State offered no evidence that a pat-down would have

---

[20] *See supra* note 6 (cataloging more than two dozen factors that contribute to the totality of the circumstances analysis).

been insufficient to determine whether Hicks was armed. The evidence the search produced must be suppressed, and Hicks's conviction cannot stand.

The majority's constitutional holding, however, does far more than simply resolve this case. It displaces *Terry*'s reasonable suspicion framework as applied to handgun encounters. It renders CR § 4-203—the General Assembly's considered judgment that handgun carrying is presumptively unlawful absent a permit—constitutionally inoperative. And it strips the licensing regime established by the Public Safety Article—the comprehensive statutory scheme that *Bruen* itself approved—of its practical enforceability in the field. It holds that officers may not detain a person to verify a permit even though carrying without one is a crime and that Maryland's shall-issue licensing system cannot be enforced through *Terry* stops. It applies language from *Bruen*—a Second Amendment case—to the Fourth Amendment, even though the U.S. Supreme Court has never done so. Those are significant consequences. They flow from a constitutional ruling that is not necessary to the judgment, resting on language from a case about handgun permit laws that the U.S. Supreme Court has never applied to the Fourth Amendment. *See Mercy Hosp., Inc. v. Jackson*, 306 Md. 556, 565 (1986) (explaining that Maryland courts may not decide constitutional questions unnecessary to the disposition of the case, particularly when a question requires the court to reconcile two different amendments). Because the frisk exceeded *Terry*'s permissible scope regardless of whether the stop was justified, this case could have been decided on that ground alone.

The concern is not merely theoretical here. The parties argued that *Terry*'s reasonable suspicion standard is no longer constitutional in cases involving licensed

33

handgun carry. They did not brief the validity of CR § 4-203(a)(1) or the licensing provisions of the Public Safety Article.[21] Those statutes were not before us. No party asked us to hold them unconstitutional, no party defended them as such, and no party had occasion to develop the arguments that their defense would require. The majority's holding reaches them anyway. Courts should be reluctant to invalidate legislative enactments on a record that was never developed with that question in mind. *See Yangming Marine Transp. Corp. v. Revon Prods. U.S.A., Inc.*, 311 Md. 496, 509 (1988) (citations omitted) (explaining that appellate courts must, "whenever reasonably possible, construe and apply a statute to avoid casting serious doubt upon its constitutionality."). A court cannot nullify a statute in the absence of a factual or adversarial predicate for doing so. As we have explained, the post-*Bruen* operation of CR § 4-203 is illuminated by two contemporaneous letters from the Office of the Attorney General that neither party briefed and that the majority does not discuss. The record contains no evidence, no findings, and no adversarial development that would permit a court to invalidate or neutralize the statutory framework the General Assembly enacted. We would have rested the judgment solely on the scope of the frisk.

---

[21] Substantive changes were made to Maryland's licensing provision under PS § 5-307(b)(1), which did not take effect until after Hick's arrest. PS § 5-307(b)(1) requires that all handguns, carried pursuant to a permit, must be concealed. We do not consider those changes to the scope of the handgun permit Hicks possessed at the time of his arrest.

34

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 634

September Term, 2024

_____

IN BANC

_____

STEVEN HICKS

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Graeff,
Berger,
Nazarian,
Arthur,
Leahy,
Reed,
Friedman,
Shaw,
Zic,
Ripken,
Tang,
Albright,
Kehoe, S.,

JJ.

_____

Concurring Opinion by Nazarian, J.

_____

Filed: June 4, 2026

I join the opinion of the Court in full. I write separately to address the concerns Judge Friedman and I share about the impact of today's ruling on the authority of police to engage, detain, frisk, and search people under the Fourth Amendment to the Constitution of the United States. Today's ruling eliminates officers' ability to rely on a presumption that a person carrying a concealed weapon does so illegally but will continue to require officers to possess individualized knowledge or make individualized observations that amount to reasonable suspicion or probable cause, as the Fourth Amendment has required all along. And in so doing, the Court's opinion recalibrates the constitutional balance between the Fourth Amendment and the Second in an analytically symmetrical and normatively fair way.

The rule the Court announces today should have the opposite effect from the effect Judge Friedman fears, if nothing else by eliminating the not-necessarily-objective presumptions of illegality and dangerousness that, before today, have given officers the unfettered discretion to conduct a full-on *Terry* stop and frisk on anyone whom they can say they perceive to have a weapon. In the context of Maryland's gun laws, this constitutional recalibration doesn't change much, but at least is constitutionally fair. The opposite approach would leave us worse off, in a world with more guns and greater opportunities for discretionary and essentially unreviewable profiling.

## I.

Judge Friedman's concurring opinion expresses the concern that eliminating officers' authority to presume that a person carrying a potentially discernible firearm does so illegally will expose vulnerable people and communities to a greater risk of improper

profiling. The specific concern is that the opinion will "redirect" the *Terry v. Ohio*[1] analysis to "amorphous" factors, such as nervousness, presence in high crime areas, associations, and prior arrest history, and "only deepen the racialized patterns of enforcement that scholars have long documented." *Hicks v. State*, ___ Md. App. ___, No. 634, Sept. Term 2024 (filed June 4, 2026) (Friedman, J., concurring), slip op. at 1–2.

Judge Friedman is right that profiling issues elude discussion in reported opinions of our appellate courts,[2] not least because profiling, even inappropriate profiling, generally cannot serve as a defense on the merits to the charges brought in the wake of a stop or a basis on which to attack a conviction. Profiling provides the basis for an officer's decision to engage with someone, but the Fourth Amendment doesn't scrutinize an officer's motives or the assumptions underlying an officer's decisions or analysis. Instead, the Fourth Amendment—in the form of judges analyzing and reviewing Fourth Amendment

---

[1] 392 U.S. 1 (1968).

[2] Our court has addressed and discussed profiling concerns in several unreported opinions, both before and after the amendments to Maryland Rule 1-104 that permit citation of unreported opinions for persuasive value. In each instance, though, the discussion recognizes in one way or another that the profiling concerns ultimately didn't and couldn't bear on the viability of the resulting conviction. *See, e.g.*, *Branch v. State*, No. 1795, Sept. Term 2023 (filed April 22, 2025), slip op. at 9 n.3 (discussing profiling concerns relating to the decision to effectuate the stop, which in that case were contradicted by body-worn camera video); *Rosa v. State*, No. 1333, Sept. Term 2023 (filed Jan. 25, 2025) (Nazarian, J., concurring) (discussing profiling concerns, including officers' specific reference to the occupants of the car as "foreign" and to the driver's accent); *Brooks v. State*, No. 894, Sept. Term 2023 (filed Oct. 30, 2024) (Friedman, J., dissenting), slip op. at 4 n.4 (noting the pretextual nature of the traffic stop and urging the Supreme Court of Maryland to reconsider its adherence to *Whren v. United States*, 517 U.S. 806 (1996) and for law enforcement to abandon the practice voluntarily); *see also Briggs v. State*, No. 2072, Sept. Term 2024 (filed May 20, 2026) (Nazarian, J., dissenting) (discussing appropriate constitutional weight to afford to officer-initiated questions and responses).

challenges—looks at the facts and circumstances known to or visible by the officer at the time of the decision to engage.

Removing the presumption of illegality changes nothing about the range of observations that can support officers' engagement in an appropriate case. As the Joint Concurrence explains at length, *see Hicks v. State*, ___ Md. App. ___, No.634, Sept. Term 2024 (filed June 4, 2026) (Berger, Friedman, and Shaw, JJ., concurring), slip op. at 6-16, the "amorphous" observations relating to neighborhoods, behavior, evasiveness, and the like contribute already to the "totality of the circumstances" officers consider in the *Terry* analysis, and in their view are entitled to consider (and even for us to consider well after the fact). And indeed, nothing in the Court's opinion diminishes officers' opportunity to make observations that would allow them to articulate suspicion, establish probable cause, and address dangerousness.

Instead, today's ruling will make officers establish their authority to conduct *Terry* inquiries on the observable merits. As Professor Aliza Hochman Bloom put it in her discussion of *United States v. Wilson*, 143 F. 4th 647 (5th Cir. 2025), a closely analogous case, "[d]espite the [Fifth Circuit's] pronouncement of an ostensibly pro-defendant rule, Mr. Wilson lost because of who he was friends with, and other legal behavior that we know is interpreted racially." Aliza Hochman Bloom, *The Emerging Firearms Hypocrisy of Terry: The Fifth Circuit in United States v. Wilson*, 78 STAN. L. REV. ONLINE 137, 149 (2025), cited in *Hicks v. State*, ___ Md. App. ___, No.634, Sept. Term 2024 (filed xxxx, 2026) (Friedman, J., concurring), slip op. at 3. Exactly, but: Mr. Wilson lost because the court backfilled the *Terry* analysis with after-the-fact factors not known to the officers in

this case when they jumped out of their vehicle to engage Mr. Hicks. Eliminating the presumption didn't prevent anyone from concluding, on those facts, that the officers had the Fourth Amendment authority to detain and search Mr. Wilson, nor to undertake our independent constitutional inquiry here.

To work with Judge Friedman's metaphor, *Hicks v. State*, ___ Md. App. ___, No.634, Sept. Term 2024 (filed June 4, 2026) (Friedman, J., concurring), slip op. at 4, we need to tend the garden of *Terry* factors carefully, but eliminating the presumption tool from the *Terry* shed weeds out some of the risk of profiling rather than fertilizing earlier opportunities for it to bloom. We can't, and shouldn't, assume categorically that "[g]un possession is objective and observable" because biased assumptions about who is and isn't likely to carry legally exposes people, especially people of color and those in highly policed communities, to profiling grounded in officers' subjective assumptions about their conduct or dangerousness. Officers should be relying only on objective observations and knowledge and evidence in the first place—objective in the sense of facts or suspicions as applied to individual situations—and not on subjective views of a person, and especially not subjective appearance- or bias-infected assessments about who a person is or might be or appears to be. At a time when ethnic profiling by law enforcement has taken on renewed visibility, and even begotten the term "Kavanaugh stop,"[3] everyone, communities of color

---

[3] *See Noem v. Vasquez Perdomo*, 606 U.S. ___, slip op. at 5–6 (Sep. 8, 2025) (Kavanaugh, J., concurring). Justice Kavanaugh wrote separately in this immigration detention case to highlight the view that apparent ethnicity is a relevant factor in assessing

4

and highly policed communities are exposed to subjective profiling already. Eliminating

the ostensibly objective presumption that anyone carrying is carrying illegally removes, by

---

reasonable suspicion that a person is present in the United States illegally under the Fourth Amendment:

> To stop an individual for brief questioning about immigration status, the Government must have reasonable suspicion that the individual is illegally present in the United States. *See Brignoni-Ponce*, 422 U. S., at 880–882; *Arvizu*, 534 U. S., at 273; *United States v. Sokolow*, 490 U. S. 1, 7 (1989). Reasonable suspicion is a lesser requirement than probable cause and "considerably short" of the preponderance of the evidence standard. *Arvizu*, 534 U. S., at 274. Whether an officer has reasonable suspicion depends on the totality of the circumstances. *Brignoni-Ponce*, 422 U. S., at 885, n. 10; Arvizu, 534 U. S., at 273. Here, those circumstances include: that there is an extremely high number and percentage of illegal immigrants in the Los Angeles area; that those individuals tend to gather in certain locations to seek daily work; that those individuals often work in certain kinds of jobs, such as day labor, landscaping, agriculture, and construction, that do not require paperwork and are therefore especially attractive to illegal immigrants; and that many of those illegally in the Los Angeles area come from Mexico or Central America and do not speak much English. *Cf. Brignoni-Ponce*, 422 U. S., at 884–885 (listing "[a]ny number of factors" that contribute to reasonable suspicion of illegal presence). To be clear, apparent ethnicity alone cannot furnish reasonable suspicion; under this Court's case law regarding immigration stops, however, it can be a "relevant factor" when considered along with other salient factors. *Id*., at 887. Under this Court's precedents, not to mention common sense, those circumstances taken together can constitute at least reasonable suspicion of illegal presence in the United States. Importantly, reasonable suspicion means only that immigration officers may briefly stop the individual and inquire about immigration status. If the person is a U.S. citizen or otherwise lawfully in the United States, that individual will be free to go after the brief encounter. Only if the person is illegally in the United States may the stop lead to further immigration proceedings.

*Id.* This concurrence's conception of a "brief encounter" with law enforcement has come to be known as a "Kavanaugh stop," a term coined in a Bluesky post by Drexel University Law School Professor Anil Kalhan. *See* Anil Kalhan (@akalhan), Bluesky, https://bsky.app/profile/akalhan.bsky.social/post/3lzt2hikyd22h.

the State's reckoning in this case, officers' otherwise-totally-discretionary ability to detain, handcuff, and conduct a full *Terry* frisk of anyone whenever an officer thinks or claims or decides that they can claim that they saw a bulge or imprint or outline or suggestion of something that might be a gun. And although it's true that *Terry*'s cautions have eroded with real-life application over time, Friedman Concurrence, slip op. at 1, we shouldn't shrug our doctrinal shoulders and give in.

## II.

It's important not to lose sight of the context, and especially not to overstate the effect of the change the Court's opinion effects. The rule the Court adopts changes the on-the-ground Fourth Amendment analysis very little. The *status quo ante* is that a visible gun is presumptively illegal, *see* Md. Code (2003, 2022 Repl. Vol.), § 5-307(b)(1) of the Public Safety Article ("PS") (requiring a person wearing, carrying, or transporting a handgun under a valid permit to conceal it from view), and that'll remain true. Legally permitted firearms in Maryland must still be concealed. We are not an open carry state, so there are few legal circumstances under which regular, non-uniformed people can carry a firearm openly. *See* PS § 5-307(c) (listing exemptions from concealed carry requirement). An officer who sees a person carrying a gun openly, then, will still have reasonable articulable suspicion that the person may be committing a crime or is dangerous or both. Nothing about today's opinion changes that. And that will be true especially for anyone holding a firearm in their hand or wearing one on top of or outside of their clothing, let alone brandishing or firing a firearm outside of a shooting range. The guns that are easiest to see, that are visible objectively, will continue to give rise to more-or-less-instant

6

probable cause.

Today's ruling recognizes only that permitted people carrying *concealed* weapons in Maryland are not committing a crime and, more to the point, shouldn't be presumed to be committing a crime if law enforcement thinks or has a hunch that they might possess one. The binding and authoritative interpretation of the Second Amendment set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), recognizes as law-abiding anyone who's carrying legally with a permit (and, in Maryland, conceals the weapon properly). *Id.* at 9–11, 38 n.9 (recognizing right of law-abiding citizens, under the Second Amendment, to carry handguns publicly for self-defense and stating that nothing in the Court's analysis "should be interpreted to suggest the unconstitutionality of 'shall-issue' licensing regimes" like Maryland's); *see* PS § 5-306(a) (providing that the State "shall issue" a handgun permit to anyone who satisfies certain requirements); PS § 5-307(b)(1). We have no occasion in this case to decide how far the Second Amendment might reach or whether it undercuts any other Maryland gun regulations or prohibitions. But we know that in response to *Bruen*, Maryland has become a shall-issue state, 2023 Md. Laws, Ch. 651 (removing requirement for an applicant to show that they have a "good and substantial reason to wear, carry, or transport a handgun" in order to obtain a permit); PS § 5-306(a), and the question of whether someone is carrying a concealed firearm in Maryland is a different question after *Bruen* than it was before. Before *Bruen*, there was good reason to believe that a person carrying a weapon, concealed or not, likely didn't have a permit to carry it. After *Bruen*, a person carrying openly in Maryland isn't carrying legally (permit or not), but a person carrying a concealed weapon very well could be. *See Bruen*,

7

597 U.S. at 9–11. The Court decides today only that for Fourth Amendment purposes, people carrying concealed weapons must be presumed to be doing so legally, at least until there's some independent basis to suspect or know otherwise. Writing on a blank slate, we might well have decided *Bruen* differently (and *Heller*[4] and their progeny too, for what it's worth). But as a state intermediate appellate court, it's our role to apply precedent to real-life cases as it evolves through the judgments and opinions of our superior courts.

### III.

The starting point for Fourth Amendment analysis is criminality, or at least potential criminality. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (explaining that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."); *Greenstreet v. State*, 392 Md. 652, 667–68 (2006) (noting that a magistrate's issuance of a search warrant must depend on probable cause, or a fair probability that the search will uncover contraband or evidence of a crime (*citing Illinois v. Gates*, 462 U.S. 213, 238–39 (2006)); *Shuler v. State*, 267 Md. App. 465, 485 (2025) ("The objective standard for probable cause to arrest [without a warrant] is whether 'the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense

---

[4] *District of Columbia v. Heller*, 554 U.S. 570, 595, 635–36 (2008) (recognizing individual right, under the Second Amendment, to keep and bear arms in the home for self-defense); *see also McDonald v. City of Chicago*, 561 U.S. 742, 750, 778 (2010) (holding that the Second Amendment right of individuals to keep and bear arms applies to the states under the Fourteenth Amendment).

8

has been or is being committed by the person to be arrested.'" (*quoting Rovin v. State*, 488 Md. 144, 183 (2024)). People have the right to be free from unreasonable searches and seizures by law enforcement. U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . .").

In the Old Days, we generally expected officers to get a warrant before undertaking searches or seizing anyone. ORIN KERR, THE DIGITAL FOURTH AMENDMENT: PRIVACY AND POLICING IN OUR ONLINE WORLD, 18–19 (2025). Cars, which had the ability to flee warrants, changed that. And the law of warrantless engagement, which always was possible but generally required a higher level of observed criminality, has evolved along with other advancements in technology as well. *See generally* KERR, *supra* (explaining how Fourth Amendment doctrine has evolved over time in response to new technologies).

At the same time, officers are always free to attempt to engage people and ask them questions, even without a warrant. *Swift v. State*, 393 Md. 139, 151–52 (2006). But unless the police have a warrant or have reasonable suspicion or probable cause, people are free to walk away, to decline to answer questions, or to refuse to provide information or identification or anything else. *Id.* at 150–52. Put the other way, officers may not detain, frisk, or search people without a warrant unless they have individualized reasonable suspicion or probable cause that a crime has been or is being committed or that the person has evidence of a crime in their possession. *Id.* at 150–51; *Wardlow*, 528 U.S. at 123; *Greenstreet*, 392 Md. at 667–68.

In this case, just as in most cases involving Fourth Amendment questions, the

9

officers didn't have a warrant. *Hicks v. State*, ___ Md. App. ___, No.634, Sept. Term 2024 (filed June 4, 2026) (majority opinion), slip op. at 1. Their authority to engage Mr. Hicks—to stop him, to detain him, to handcuff him, to pat him down, to arrest him, or to search him—depended on whether they had and could articulate reasonable suspicion or probable cause that he was committing or had committed a crime. *Wardlow*, 528 U.S. at 123; *Shuler* 267 Md. App. at 484–85; *Swift*, 393 Md. at 150–51. Officers can't just suspect a person has committed some crime somewhere—they must suspect reasonably or have probable cause to believe he has committed or is committing a particular crime and must have evidence or observations to back that up at the time of the engagement. *See Crosby v. State*, 408 Md. 490, 506 (2009) ("[A] police officer who has reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provoked suspicion." (citation omitted)); *Trott v. State*, 473 Md. 245, 265 (2021) ("[O]ur determination of whether an officer has the reasonable suspicion necessary to justify an investigatory stop is a highly fact-intensive inquiry, and we consider the totality of the circumstances known to the officer *at the time of the stop*. (emphasis added)). The available information can, of course, evolve over the course of the encounter, as it often does as police stop people, talk to them, see more, and learn more. *See Ransome v. State*, 373 Md. 99, 113 n.1 (2003) (Raker, J., concurring) ("[T]he police may use information gathered during a consensual encounter to justify a *Terry* stop if they gather sufficient information to develop reasonable suspicion . . . ."). And the scope of officers' authority to stop and detain people and to pat them down, frisk them, arrest them, and search them can evolve as well. *See id.*; *Barnes v.*

10

*State*, 437 Md. 375, 390-91 (2014) ("An officer who possesses the requisite suspicion for a stop is authorized to detain the person for a reasonable period of time, measured by the particular facts and circumstances at hand, in order to investigate the suspected criminal behavior. If, during that time, the officer's suspicion ripens into probable cause to believe the individual has committed or is committing a crime, then an arrest lawfully may ensue. But if the officer does not develop either probable cause for an arrest or reasonable suspicion for a 'superseding stop,' then the officer must immediately release the detainee. Any continued detention, unsupported by the requisite suspicion, is unreasonable and, consequently, in violation of the Fourth Amendment." (citation omitted)); *Jackson v. State*, 190 Md. App. 497, 515 (2010) (noting that justification for a *Terry* stop can arise during a traffic stop based on "'[u]nfolding events'" (*quoting State v. Ofori*, 170 Md. App. 211, 245 (2006)). The authority to intrude must evolve in sync with the information—the Fourth Amendment doesn't allow officers to frisk or search first and build the basis later. *Kopp v. State*, ___ Md. ___, No. 34, September Term 2025 (filed May 26, 2026), slip op. at 32 ("An officer's testimony about a location being a 'high-crime area' or there being any volume of crime in an area, like testimony concerning any other factor in the reasonable suspicion analysis, must be based on information known to the officer at the time of the stop."), 37 (the officer's "testimony about the level of crime in the [particular area] does not satisfy the fundamental requirement that the reasonable suspicion analysis be based on information known by a police officer at the time of the seizure . . ." (citing *Terry*, 392 U.S. at 21–22)); *cf. Crosby*, 408 Md. at 506; *Trott*, 473 Md. at 265. Fourth Amendment analysis asks what the police knew or suspected and when, then measures the knowledge timeline

11

against the intrusion timeline. *See Crosby*, 408 Md. at 506; *Trott*, 473 Md. at 265. If the knowledge timeline runs ahead of the intrusion timeline, the police are on stronger footing; when the intrusion precedes the knowledge, officers may well be acting without authority.[5]

The informational touchpoint for all of this is a crime—in this case, a gun possession crime and nothing else. When the police encountered Mr. Hicks in this case, they were in the area investigating something else altogether and there is no claim that they knew him, knew anything about him, or had any basis to stop or engage him before they pulled up alongside him. *Hicks*, slip op. at 2 (majority opinion). The State contends that Mr. Hicks was dangerous from the mere presence of the gun they perceived, not from any other observation. So in this case, we measure the officers' reasonable suspicion or probable cause against the elements of the gun possession crime they said that they suspected.

And when substantive criminal law changes, Fourth Amendment analysis must change along with it. We have recognized and applied new legal principles before, most recently as our legislature decriminalized, then legalized, the use of cannabis by adults.

---

[5] I acknowledge that, as the Joint Concurrence discusses, our cases have recognized our discretion to consider in our independent constitutional analysis facts from the suppression record beyond those that the parties and the suppression court relied on. *See Hicks v. State*, ___ Md. App. ___, No.634, Sept. Term 2024 (filed June 4, 2026) (Berger, Friedman, and Shaw, JJ., concurring), slip op. at 8-11 (citing, among others, *Martin v. State*, 267 Md. App. 556, 574 (2025) and *Morris v. State*, 153 Md. App. 480, 489-90 (2003)). Our Supreme Court has neither endorsed nor restricted this discretion in so many words, it seems. But even where we decide it's appropriate to exercise this discretion, we have to acknowledge that we're stretching the Fourth Amendment, after the fact, to reach farther than the parties or the suppression court did. And our Supreme Court's new opinion in *Kopp* states and applies traditional timing principles and, importantly, rejected the argument in that case that information acquired after the stop could contribute to the reasonable suspicion analysis. *Kopp*, ___ Md. at ___, slip op. at 32, 37.

2014 Md. Laws, Ch. 158 (decriminalizing use or possession of ten grams or less of marijuana); 2023 Md. Laws, Ch. 802 (legalizing use or possession of ten grams or less of marijuana); Md. Code (2002, 2021 Repl. Vol.), § 5-601 of the Criminal Law Article. Before decriminalization, the mere odor of marijuana gave rise to probable cause to arrest and search incident to arrest. *See Robinson v. State*, 451 Md. 94 (2017). After decriminalization, our courts had to recalibrate that analysis as we applied the new law to new cases. As a result, the odor of marijuana still can give rise to probable cause to search a car, *see Pacheco v. State*, 465 Md. 311 (2019), but not an individual, *Lewis v. State*, 237 Md. App. 661 (2018), *rev'd*, *Lewis v. State,* 470 Md. 1 (2020); *see also id.*, 237 Md. App. at 690–91 (Arthur, J., concurring in the judgment); *id*. at 692–93 (Nazarian, J., dissenting). Marijuana odor can give officers a basis to engage people but isn't enough by itself to support a *Terry* frisk. *See In re: D.D*., 479 Md. 206, 240–42, 247 (2022). And reasonable suspicion, even as to weapons, must be individualized and can't be inferred simply from the potential presence of drugs. *See Norman v. State*, 452 Md. 373, 411 (2017).

**IV.**

When the definition of a crime evolves, officers' authority under the Fourth Amendment to detain people, frisk people, and search people must evolve along with it. As our Fourth Amendment law evolved along with our cannabis laws, so must our Fourth Amendment law evolve to reflect changes in the underlying substantive Second Amendment law:

> As a result of *Bruen* and [*United States v. Rahimi*, 144 S. Ct. 1889 (2024)], suspected or actual possession of a firearm can no longer carry the same weight in a reasonable articulable particularized suspicion analysis. It is

presumptively lawful activity, like nervousness or walking quickly. And because it is lawful, being "armed" should not be equated with being "armed and dangerous." Although laws prohibiting firearm possession based on criminal history or a history of violence may still be constitutional, simply seeing a gun offers no information about whether the carrier is prohibited from possessing a gun, or whether they have a permit. Possessing a firearm should, at most, get the same minor weight that officer observations of "furtive behavior," a "high-crime" area, or other noncriminal indicia do. Because these behaviors are intrinsically lawful, they should carry considerably less weight in the *Terry* analysis even if considered in the aggregate.

Lila Nazarian, Comment, *Peaceable Public Carry: The Evolving Landscape Of Second And Fourth Amendment Rights, And The Task For Criminal Defense Attorneys*, 49 MICH. J. L. REFORM (forthcoming 2026), at 26–27, available at SSRN: https://ssrn.com/abstract=6030654 or http://dx.doi.org/10.2139/ssrn.6030654 (footnotes omitted). The details are, of course, for courts to work out in the aftermath of the constitutional ruling, as they apply the specific facts of a particular search to the elements of the substantive criminal law that officers suspected was being violated. This case is Maryland's first post-*Bruen* example of this work.

As the Court's opinion describes, the law of lawful concealed carry in Maryland now has evolved. Before *Bruen*, it was comparatively rarely legal for people to be able to carry a firearm. After *Bruen*, and as a result of *Bruen*, Maryland is now a shall-issue state. *Bruen*, 597 U.S. at 38 n.9; PS § 5-306(a). A person's right and ability to seek a permit isn't a function of their profession or status—their right to bear arms inheres through the Second Amendment and, after *Bruen*, can't be limited to people who have a special need or justification. *Bruen*, 597 U.S. at 11 (holding that New York law conditioning issuance of license to carry a firearm on showing of "special need" for self-defense violated the Second

Amendment). By constitutional definition, then, the universe of people who could be carrying a concealed weapon in Maryland legally has expanded. Gun ownership grew substantially among Black Americans during the COVID-19 pandemic and in the wake of protests against police violence following the murder of George Floyd in Minneapolis. *See The Past and Present of Gun Ownership in the US*, GIFFORDS (Feb. 23, 2021), https://giffords.org/stories/the-past-and-present-of-black-gun-ownership-in-the-us/, *archived at* https://perma.cc/B8XW-FYLF. Nobody offered any Maryland statistics to this effect in the record in this case, but according to the Maryland State Police Licensing Division, which issues carry permits, its Handgun Permit Unit processed 84,108 total applications during 2024, a 21% increase over 2023. *See* MARYLAND DEPARTMENT OF STATE POLICE, MARYLAND STATE POLICE ANNUAL REPORT 2024, at 34, https://lipa.access.preservica.com/uncategorized/IO_9f7232e0-51c3-4bde-b095-99551eb157bf/ (last visited May 20, 2026). Citing the State Police as well, the Baltimore Banner reported in April 2025 that more than 200,540 people in Maryland held a permit to carry a handgun in public, up from fewer than 50,000 in 2020. Rick Hutzell, *200,000 People Can Carry Guns in Maryland. Here's Where They Are.*, BALTIMORE BANNER (Apr. 25, 2025, at 5:30 ET), https://www.thebanner.com/opinion/column/handgun-carry-permits-growth-maryland-GOFAERDORNCZFE726JBCO6WSPI/, *archived at* https://perma.cc/QK7M-3TA6. And as the number of people carrying legally increases, officers no longer can discern who is carrying legally by looking for, say, a law enforcement uniform, a badge, or some other obvious and unambiguous indicator of permit status.

The fact that officers might discern a potential firearm doesn't oblige them to engage or investigate. They have total discretion to decide where to look for crimes, including weapons crimes, in the first place, and whether to engage someone at all. The State acknowledged at argument, as it must, that the police have essentially unfettered discretion to decide whom to engage when they see something that they think gives rise to reasonable suspicion or probable cause. The ostensible objectivity of the threshold possession question makes it significantly easier to initiate that encounter than if officers need to develop individualized suspicion or probable cause from observable circumstances. Nor does the fact that someone must have a permit to carry legally alter this analysis. People can't operate motor vehicles in Maryland without a license, but officers first must have reasonable suspicion to stop someone to check their license status. *State v. Stone*, 493 Md. 78, 85 (2026). The barrier to a traffic stop is a low one, as we know from the universe of *Whren*[6] stop cases, *see, e.g., Riley v. State*, 266 Md. App. 598, 615-21 (2025) (analyzing allegedly pretextual traffic stop under Fourth Amendment using *Whren* doctrine, and declining to limit pretextual stops under the Maryland Declaration of Rights independently), but at least it's there, and cars are plenty dangerous.

The post-*Bruen* changes in the underlying substantive law make the visibility of guns a ripe area for profiling and, unfortunately, profiling grounded in assumptions about people—specifically, who people are, or might be, and whether they are likely to be

---

[6] *Whren v. United States*, 517 U. S. 806 (1996) (Fourth Amendment does not forbid pretextual traffic stops so long as reasonable suspicion for a traffic crime exists).

16

permitted or to be dangerous. "'History and tradition' is rising to prominence in Second Amendment jurisprudence as a way to determine the constitutionality of gun laws, but that approach is significantly complicated by the fact that many gun laws adopted over the course of American history were racially motivated." Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harvard L. Rev. 537, 538 (2022). "Laws prohibited Black people from owning guns and using firearms in America beginning in the 1700s. White colonists feared Black people—both free and enslaved—and expected them to rebel against slavery causing violence and insurrectionist protest." Margaret H. C. Tippett, Comment, *Implicitly Inconsistent: The Persistent and Fatal Lack of Second Amendment Rights for Black Americans in Self-Defense Claims and the Importance of Telling the Counter-Story*, 82 Md. L. Rev. Online 68, 73 (2022). The Black Codes of the 1850s "included regulations that barred free Black men from carrying and owning guns—leaving all Black men defenseless against Southern white men during attacks." *Id.* at 81. In 1843, the Maryland Court of Appeals noted that "free African Americans were 'treated as a vicious or dangerous population' in Maryland, and thus 'laws have been passed to prevent their migration to this State,' including restrictions that 'make it unlawful for them to bear arms.'" Bob Barr & Joseph G. S. Greenlee, *When Rights Require Permission: The Discriminatory History of Licensing Arms for Firearm Possession*, 129 DICK. L. REV. 1019, 1037 (2023) (*citing Waters v. State*, 1 Gill 302, 309 (Md. 1843)), https://insight.dickinsonlaw.psu.edu/cgi/viewcontent.cgi?article=1237&context=dlr. In 1967, and shortly after the Black Panthers arrived at a luncheon event with Governor Ronald Reagan armed with pistols and shotguns, California passed the Mulford Act, which

17

banned the carrying of loaded guns in public, and put the law into immediate effect. Tippett, *supra*, at 84. "Even after the Fourteenth Amendment's ratification, many states implemented facially neutral gun control laws with a clear intent that they be stringently enforced in a discriminatory manner against disfavored populations like immigrants and African-Americans." *The Essential Second Amendment: The Racist Roots of Gun Control*, HERITAGE.ORG, https://www.heritage.org/the-essential-second-amendment/the-racist-roots-gun-control (last visited May 18, 2026).

Furthermore, "[s]ocial perceptions of the 'dangerous' Black man infiltrate the idea of what constitutes 'danger,' directly affecting whether a jury member will justify an individual's use of force."[7] And "[p]ersistent stereotypes are rooted in the Second Amendment: White people who use guns for self-defense are labeled as heroes and protectors, while Black people who carry or use guns for self-defense are stereotyped as the 'dangerous' Black man trope." Tippett, *supra*, at 71–72 (footnotes omitted). These stereotypes reveal themselves in social science research: white participants in a study measuring the strength of people's association between race and gun rights

> showed that they more strongly associated White Americans with gun rights and Black Americans with gun control. As expected, this overall association was primarily driven by White participants who held strong anti-Black attitudes, because these White participants showed a pronounced mental association between gun rights and White Americans (and between gun

---

[7] Tippett, *supra*, at 93 (*first citing* Jim Sliwa, *People See Black Men As Larger, More Threatening Than Same-Sized White Men*, AM. PSYCH. ASS'N (Mar. 13, 2017) (discussing a study that found Black men to be disproportionately more likely to be shot and killed by police by reason of their "physical size"), *then citing* Ian Millhiser, *Man Sentenced to Die After 'Expert' Testified That Black People Are Dangerous*, THINKPROGRESS (Apr. 25, 2016)).

control and Black Americans), whereas those who did not hold strong anti-Black attitudes did not.

Gerald D. Higginbotham et al., *Guns and racism: Who do White Americans really perceive gun rights to be for in the United States*, AM. PSYCH. ASS'N (Aug. 23, 2023), https://www.apa.org/pubs/highlights/spotlight/issue-269. And "[e]ven if gun laws today are not typically racially motivated, some of them likely have a racially disproportionate impact, and the history of racist gun laws serves as a reminder to try to avoid, eliminate, or at least minimize such discriminatory effects. People of color are far overrepresented among those convicted of federal firearms offenses." Winkler, *supra*, at 544–45. As a matter of policing strategy, and "[a]bsent significant reform of the criminal justice system, people of color are almost certain to make up an excessive percentage of gun law violations." *Id.* at 545.

In any given case, and in all cases, our independent constitutional analysis cannot ignore the possibility that an officer's stated perception of a person's potential criminal behavior or dangerousness was influenced by assumptions and stereotypes about who people are. This is especially true when a particular decision to engage a person, as in this case, isn't grounded in anything beyond the possibility of possession. Generalized criteria like "high crime neighborhoods" can sound like a neutral proxy for the people present there, but it isn't hard to imagine officers in some parts of the State, in some neighborhoods or areas, being perfectly happy to leave people carrying guns alone. And why might an officer decide that one person is more likely to have a permit than another? Or that one person is more of a danger than another? Unless the officers know something specific and

individual about that person and that situation, a decision to engage risks being based on assumptions about who that person is, not their present behavior or anything objective.

People vulnerable to profiling are protected better if officers can't rely on assumptions about the likelihood of permitted status or their potential for dangerousness and have to stick to objectively known or observable facts. If officers can presume everyone carrying is committing a crime—in other words, without the presumption that concealed carriers carry legally—everyone with a bump in their clothing is exposed to a discretionary stop, to being handcuffed, to having their gun taken away, and to a full-on frisk, all with the attendant "plain view" and "plain feel" opportunities. If officers can stop and frisk on the mere sight of something they can characterize as a gun not concealed sufficiently, they then can stop and frisk people who are, as a matter of law, less likely to be committing any sort of crime. If they can do all of that on the sight of a gun concealed properly, they can handcuff and frisk people acting legally, even under the pretext of checking for permits. But if officers have to presume that a concealed, or nearly concealed (since the statute allows for momentary revelations and clothing failures) weapon is legal, they need to build suspicion or probable cause from something independent of the potential gun.

Can officers make independent observations in a manner that embodies assumptions, stereotypes, and racism? Absolutely. But they can do that all the more easily when armed, as it were, with the presumption that any potential gun is illegal. If they can decide who they think is more likely to be a legal carrier or who is more likely to be dangerous based on who the person is, the opportunity for race- and other appearance-

20

based assumptions to drive that decision expands too broadly.

I join the opinion of the Court in full.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 634

September Term, 2024

_____

IN BANC

_____

STEVEN HICKS

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Graeff,
Berger,
Nazarian,
Arthur,
Leahy,
Reed,
Friedman,
Shaw,
Zic,
Ripken,
Tang,
Albright,
Kehoe, S.,

          JJ.

_____

Concurring Opinion by Leahy, J.

_____

Filed: June 4, 2026

We all agree that the frisk of Hicks exceeded constitutional limits and that the motion to suppress should have been granted. Even so, this case has divided our court. That makes sense. The rights at stake in this case are fundamental, and Maryland's interest in handgun safety and public safety are compelling.[1] The Joint Concurring Opinion by Berger, Friedman, and Shaw ("Joint Concurring Opinion") is rightly concerned that the majority's application of *NYSRPA v. Bruen*, 597 U.S. 1 (2022), risks rendering Maryland's handgun permitting scheme unenforceable. Hicks was not just carrying a handgun; he was *visibly* carrying the handgun in public, such that police could see "the rear handle of a handgun" in his waistband and "the angular shape" of the rest of the gun through his t-shirt. Majority Opinion at 2. That conduct alone would violate today's concealed carry laws, which were enacted shortly before Hicks was stopped and became effective shortly after.[2] Officers also observed Hicks separate from the crowd as their unmarked police vehicle approached and then try to "blade" or shield his gun from their view. Majority Opinion at 4. If police cannot even *stop* Hicks under those circumstances, then Maryland

---

[1] According to the U.S. Centers for Disease Control and Prevention, "[i]n 2022, there were more than 48,000 firearm-related deaths in the United States according to mortality data. That's about 132 people dying from a firearm-related injury each day." *CDC Fast Facts: Firearm Injury and Death*, Ctr. for Disease Control & Prevention (updated July 5, 2024), https://perma.cc/WXS8-CR64. "In 2024, 76% of all U.S. homicides (15,364 of 20,162) involved a firearm." John Gramlich, *What the data says about gun deaths in the U.S.*, Pew Rsch. Ctr. (April 28, 2026), https://perma.cc/W9S8-QKRL; *see generally Maryland Shall Issue, Inc. v. Hogan*, 566 F. Supp. 3d 404, 428, 434 n.15 (D. Md. 2021), *aff'd sub nom. Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) (en banc). In 2019, "there were 543 homicides in Maryland. And, out of 514 homicides by firearm, 462 involved a handgun." *Id.* at 428 n.14.

[2] Md. Acts 2023, ch. 680 (approved May 16, 2023, effective Oct. 1, 2023).

now has a concealed-carry licensing regime but lacks the means to enforce it. Such a result would be inconsistent with the many pronouncements from the Supreme Court of the United States that states may regulate and license handgun use. *United States v. Rahimi*, 602 U.S. 680, 693 (2024); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).

I write separately to highlight that the carefully reticulated framework that the General Assembly crafted—Maryland Code (2002, 2021 Repl. Vol), Criminal Law Article ("CR") §§ 4-203 and 4-206—prescribes the best way to navigate police interactions with Marylanders who carry guns. Even without Maryland's long-held presumption that carrying a handgun is presumptively unlawful, *see* Joint Concurring Opinion at 31, these statutes provide a framework within the bounds of the Second and Fourth Amendments that works step by step through an initial consensual encounter, a demand for proof of licensure, a limited search for a gun, and if called for, seizing the gun and arresting the person.

### CR § 4-206

In 1972, the General Assembly was grappling with a changing legal terrain in the wake of the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968). Then-Governor Marvin Mandel filed emergency legislation, Senate Bill 205 ("SB 205"), to "repeal[] and re-enact[], with amendments," Section 36 of Article 27 of the Code of Maryland. Acts 1972, ch. 13, at 38. The concerns expressed at the time were not unlike those pressed

2

today.  Although crime statistics were worrisome and people called for legislative action, many had reservations about empowering police to stop and frisk.[3]

Senate Bill 205 added two sections that would later be re-codified as CR §§ 4-203 and 4-206.  First, Section 36B stated that, except as provided, a person may not, among other things, "wear, carry, or transport any handgun, whether concealed or open, on or about his person," without a permit.  Acts 1972, ch. 13, at 40.  This general prohibition was a response to "a substantial increase in the number of persons killed or injured [due

---

[3] The bill file for SB 205 contains correspondence and testimony from members of the public, political and social organizations, administrative officials, and legislators.  Leg. Bill file, Senate Bill 205, 1972 Leg., 375th Sess. (Md. 1972) ("Bill File").  Members of the legal community expressed concerns about the potential for police misconduct.  *See e.g.*, *Letter from Geo. Univ. L. Ctr. to John J. Sexton, Esq.* 1 (Jan. 21, 1972), Bill File at 176.  Sporting groups worried that the provisions in subsection 36B prohibiting transporting handguns would restrict their members' recreational activities.  *See, e.g.*, *Letter from Naval Ordnance Lab'y Rifle & Pistol Club to Martin A. Kircher* 1 (Feb. 9, 1972), Bill File at 156.  Another group noted "reservations about the 'stop and frisk' provisions" of SB 205 and stressed the importance "that the law protect citizens against dragnet procedures" and that "civil liberties safeguards be provided against unreasonable harassment on the part of the police."  *Statement of J. Elliott Corbett of the United Methodist Bd. of Christian Soc. Concerns before the House Judiciary Comm.* 5 (Feb. 3, 1972), Bill File at 170.

The Attorney General also wrote a letter to the Governor.  *Letter from Francis Burch & Thomas J. Kenney* (1972), Bill File at 12.  Given the "considerable discussion of the 'stop and frisk' provisions" in section 36D, the Attorney General noted that "[t]he language of Section 36D obviously parallels the language of the Supreme Court in *Terry* very closely."  *Id.* at 2, Bill File at 13 (emphasis added).  Although the Attorney General found that SB 205 was "constitutional on its face[,]" *id.*, he also presented arguments against the application of *Terry* and "stop and frisk" procedures for "'possessory' offense[s]" including "carrying a handgun" due to concerns that police misconduct may arise if the criminal activity does not have "objective outward manifestations[.]"  *Id.* at 3-4, Bill File at 14-15.  Ultimately, the Attorney General advised the Governor that there was "nothing explicit in the *Terry* opinion to indicate that the rationale is inapplicable to possessory offenses" and pointed to Justice Harlan's concurrence, which the Attorney General thought suggested that "*Terry* would support a state stop and frisk statute."  *Id.* at 4, Bill File at 15 (emphasis added).

3

to] . . . the carrying of handguns[.]" *Id.* The drafters of SB 205 felt that "further regulations on the wearing, carrying, and transporting of handguns [were] necessary to preserve the peace and tranquility of the State[.]" *Id.* Rather than view the new statute as limiting the liberties of citizens, the drafters sought to "protect the rights and liberties of" Marylanders. *Id.*

Second, in Section 36D, SB 205 established a procedure for officers to conduct what legislators at that time referred to as a "limited search" to determine if a person was "wearing, carrying, or transporting a handgun in violation of Section 36B[.]" Acts 1972, ch. 13, at 47. As it reads today,[4] the statute provides, in relevant part:

> (a)(1) A law enforcement officer may make an inquiry and conduct a limited search of a person under paragraph (2) of this subsection if the officer, in light of the officer's observations, information, and experience, reasonably believes that:
>
> > (i) the person may be wearing, carrying, or transporting a handgun in violation of § 4-203 of this subtitle;
> >
> > (ii) because the person possesses a handgun, the person is or presently may be dangerous to the officer or to others;
> >
> > (iii) under the circumstances, it is impracticable to obtain a search warrant; and

---

[4] In 2002, the Maryland General Assembly passed House Bill ("HB") 11 which recodified Article 27 into a new article in the Maryland Code—the Criminal Law Article. Acts 2002, ch. 26, at 197. As part of the recodification, 36D was renumbered to CR § 4-206. Acts 2002, ch. 26, at 341-344 (containing the text of CR § 4-206 as passed in 2002). Described as a "non[-]substantive revision of the state criminal code[,]" HB 11 moved the "prohibited acts involving weapons and firearms" to Title 4 of the new Article. *Floor Report on House Bill 11* at 1-2 *in Leg. Bill File for House Bill 11*, 2002 Leg., 416th Sess., 27 (Md. 2002). The text of CR § 4-206 largely mirrored the text of 36D as passed in 1972, with minor alterations. *See Revisor's Note*, Acts 2002, ch. 26, at 343-44 (detailing differences between 36D and CR § 4-206).

4

(iv) to protect the officer or others, swift measures are necessary to discover whether the person is wearing, carrying, or transporting a handgun.

(2) If the circumstances specified under paragraph (1) of this subsection exist, a law enforcement officer:

(i) may approach the person and announce the officer's status as a law enforcement officer;

(ii) may request the name and address of the person;

(iii) if the person is in a vehicle, may request the person's license to operate the vehicle and the registration of the vehicle;

(iv) may ask any question and request any explanation that may be reasonably calculated to determine whether the person is unlawfully wearing, carrying, or transporting a handgun in violation of § 4-203 of this subtitle; and

(v) if the person does not offer an explanation that dispels the officer's reasonable beliefs described in paragraph (1) of this subsection, may conduct a search of the person limited to a patting or frisking of the person's clothing in search of a handgun.

(3) A law enforcement officer acting under this subsection shall take into account all circumstances of the occasion, including the age, appearance, physical condition, manner, and gender of the person approached.

(b)(1) If the officer discovers that the person is wearing, carrying, or transporting a handgun, the officer may demand evidence from the person of the person's authority to wear, carry, or transport the handgun in accordance with § 4-203(b) of this subtitle.

(2) If the person does not produce the evidence specified in paragraph (1) of this subsection, the officer may seize the handgun and arrest the person.

* * *

(e)(1) This section may not be construed to limit the right of a law enforcement officer to conduct any other type of search or seizure or make an arrest that is otherwise authorized by law.

CR § 4-206.

This statutory scheme remains an exemplary procedure, even today. It is divided into three components that reflect the three categories of police-citizen encounters recognized by our decisional law.

*First*, CR § 4-206(a)(2) authorizes police to question a person they suspect may be carrying a handgun in violation of the law and "request any explanation that may be reasonably calculated to determine" whether the person is carrying the handgun lawfully.[5] At this stage, the Fourth Amendment is not implicated "simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). These "consensual encounters" between police and citizens are not searches or seizures for Fourth Amendment purposes so long as they do not involve any "restraint of liberty and elicit[] an individual's voluntary cooperation with non-coercive police contact." *Trott v. State*, 473 Md. 245, 256 n.6 (2021) (quoting *Swift v. State*, 393 Md. 139, 151 (2006)); *see also Ferris v. State*, 355 Md. 356, 375-76 (1999) (describing the "test to determine whether a particular encounter . . . was simply a consensual non-constitutional event is whether a reasonable person would have felt free to leave.") (quotations omitted). Similarly, an individual's Second Amendment rights are not violated when an officer asks to see a person's gun license. Even after *Bruen*, law enforcement officers remain entitled to ensure only "law-abiding" citizens carry handguns in compliance with Maryland's "shall issue" gun licensing laws which "'comport with the principles underlying the Second

---

[5] I acknowledge that CR § 4-206(a)(2) applies only when police already have reasonable suspicion that the person is carrying the handgun *unlawfully*. But under basic Fourth Amendment principles, police may commence a similar encounter even when they suspect the person is carrying the gun *lawfully*.

6

Amendment' and [are] 'consistent with the principles that underpin our regulatory tradition.'" *Fooks v. State*, 490 Md. 458, 463 (2025), *cert. denied*, 224 L. Ed. 2d 4 (Feb. 23, 2026) (quoting *United States v. Rahimi*, 602 U.S. 680, 692 (2024)); *see also NYSRPA v. Bruen*, 597 U.S. 1, 9-10 (2022) (agreeing with the proposition that "ordinary, law-abiding citizens have a [ ] right to carry handguns publicly for their self-defense").[6] Indeed, as the Fourth Circuit recently explained, Maryland's "type of licensing law is presumptively constitutional because it operates merely to ensure that individuals seeking to exercise their Second Amendment rights are 'law abiding' persons." *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 216 (4th Cir. 2024) (en banc) (quoting *Bruen*, 597 U.S. at 38 n.9). Maryland's statute thus respects individual rights and liberties by directing officers to begin with a simple inquiry if, for example, they see a person is carrying a gun improperly, so long as there are no other circumstances that would put the officer at risk.

*Second*, if the person's response to an officer's questioning does not dispel the officer's reasonable suspicion that the person is carrying a gun unlawfully, then under CR § 4-206(a)(2)(v), the officer may conduct a search of that person. *See Swift,* 393 Md. at

---

[6] Many states have laws allowing officers to ask for an individual's handgun permit. *See, e.g.*, Virginia Code § 18.2-308.01(A) ("The person issued the permit shall have such permit on his person at all times during which he is carrying a concealed handgun and shall display the permit . . . upon demand by a law-enforcement officer."); New Mexico Admin. Code 10.8.2.16(D) ("A licensee carrying a concealed handgun on or about his person in public shall, upon demand by a peace officer, display their valid license to carry a concealed handgun."). In Michigan, any evidence of a concealed firearm is reason enough for police to ask for proof of a license. *People v. Williams*, No. 365299, 2024 WL 1684856, at *8 (Mich. Ct. App. 2024); M.C.L 28.425f(2)(a) ("An individual who is licensed to carry a concealed pistol and who is carrying a concealed pistol . . . shall show . . . a peace officer upon request by that peace officer: (a) His or her license to carry a concealed pistol.").

7

150 (explaining that a *Terry* stop "must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop and briefly detain an individual").  This is because when operating within the ambit of CR § 4-206, the consensual encounter was precipitated by the officer's reasonable suspicion that the person may be carrying the handgun in violation of CR § 4-203.[7]  If, however, an officer questions a person when the officer has no articulable reason to believe the person is carrying a gun in violation of Maryland's gun permitting regulations or any other laws, I would agree with the majority that the person has a "right to ignore the police and go about his business."[8]  Majority Opinion at 15 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)); *see also Kopp v. State*, No. 34, Sept. Term, 2025, 2026 WL 1469044, at \*20 (Md. May 26, 2026) (describing Kopp as "someone who was free to go, choosing not to engage with a police officer[,]" under his "well-recognized right to decline a consensual encounter with law enforcement.") (citations omitted)).

---

[7] The Supreme Court of Maryland recently construed CR § 4-203 in *Engage Armament LLC v. Montgomery Cnty.*, No. 9, Sept. Term 2025, 2026 WL 1144313 (Md. Apr. 28, 2026).  The Court noted that CR § 4-203 starts with a "general prohibition" on carrying guns and then creates various "carve-outs."  2026 WL 1144313, at \*21-22.  This structure was relevant in *Engage*, because the Supreme Court was deciding whether a county ordinance prohibiting the carrying of guns would create conflicting laws that would justify state preemption of the county ordinance.  *Id*.  The Supreme Court did not address whether CR § 4-203 makes all firearm carrying presumptively unlawful.

[8] Some could the view the consensual encounter under CR § 4-206(a)(2) as illusory because the person would not actually have the right to walk away.  However, what matters is that the circumstances of the encounter, as explained above, allow the person to *believe* they have the right to walk away—and indeed, the officer may allow them to.  More importantly, the critical feature of the procedure in CR § 4-206(a)(2) is that it gives a person the opportunity to dispel the officer's reasonable suspicion before there is a frisk or search.

8

Maryland became a "shall issue" state and changed the statutes governing the scope of a permit and how a handgun may be carried while this case was pending. In this context, I worry that the majority opinion will be read to mean that possession of a gun, no matter how it is carried, cannot justify such an investigatory stop.[9] Majority Opinion at 37. But reasonable suspicion requires relatively few facts, one of which may now be the failure to properly conceal a handgun pursuant to PS § 5-307. It is evident from the passage of SB 205 that the Maryland legislature also recognized this, as the amendments call attention to the procedures officers may follow to determine whether an individual is illegally wearing, carrying, or transporting a handgun. CR §§ 4-203, 4-206.

*Third,* if during the officer's limited search under CR § 4-206(a)(2)(v) the officer finds that the individual is "wearing, carrying, or transporting a handgun, the officer may demand evidence" that the individual has "authority to wear, carry, or transport the handgun[.]" CR § 4-206(b)(1). This is typically resolved by presenting a handgun permit, which licensed carriers must keep on their person.[10] If such evidence is not presented, "the officer may seize the handgun and arrest the person." CR § 4-206(b)(2).

---

[9] The majority acknowledges that in a future case a stop may be justified based on violation(s) of PS § 5-307(b)(1). Majority Opinion at 39. This underscores why this pivotal constitutional issue should not be decided on the facts presented in *Hicks* that today would supply the justification for a *Terry* stop under PS § 5-307(b)(1). *See Blake v. State,* 485 Md. 265, 305 (2023) ("Even if a constitutional issue is properly raised and decided at the trial level, this Court will not reach the constitutional issue if it is unnecessary to do so.") (quoting *Robinson v. State*, 404 Md. 208, 217 (2008)).

[10] In Maryland, permittees must "carry the permit in the person's possession whenever the person carries, wears, or transports a handgun." Maryland Code (2003, 2022 Repl. Vol.), Public Safety Article ("PS") § 5-308.

9

My point is not that this procedure supplants Fourth Amendment analysis. Indeed, our Court has held that an officer's failure to adhere to the CR § 4-206 procedure is not sufficient to exclude evidence. *Allen v. State*, 85 Md. App. 657, 673 (1989) ("The Legislature did not provide for an exclusionary sanction for violations of the procedures specified in the statute[,]" and thus "the Constitution alone serves as the basis for suppression of evidence."). My point is instead that the statute sets out a sensible procedure and a constitutionally compliant strategy for law enforcement managing any confrontation with persons they observe carrying handguns.[11] There will no doubt be situations in which an officer who already has reasonable suspicion of unlawful activity should skip straight to a stop and perhaps a frisk to protect the individual, the officer, or the public. That is precisely what happened here.

### Hicks

Applying the statutory procedure provided in CR § 4-206 and our decisional law to the instant case, I agree with the Joint Concurrence that the officers who stopped Hicks were justified in skipping a consensual interaction and proceeding directly to a limited search of Hicks. The officers who stopped Hicks had a reasonable suspicion that he was engaged in illegal activity, given the additional factors the officers observed prior to the encounter. *See* Joint Concurring Opinion at 9-13 (summarizing relevant factors).

---

[11] *See* Joint Concurring Opinion at 27, n.18 ("The question is not whether CR §4-206 independently requires suppression—it does not—but whether the legislative judgment it embodies informs the Fourth Amendment reasonableness inquiry.").

10

I reach this conclusion in part because handguns are themselves exceptional when developing reasonable suspicion of unlawful activity. Maryland courts have long recognized that firearms are inherently dangerous and that their presence materially heightens the risks officers face during investigative encounters. *In re David S.*, 367 Md. 523, 541 (2002) (possession of handgun creates reasonable suspicion that carrier is armed and dangerous); *State v. Sizer*, 230 Md. App. 640, 651 (2016), *aff'd* 456 Md. 350 (2017) ("A suspect with a licensed handgun is just as dangerously armed as is a suspect with an unlicensed handgun."). The presence of a handgun also diminishes the quantum of additional factors officers must establish in the totality of the circumstances analysis. Even outside the *Terry* context, the Supreme Court has recognized that "a gun is an article that is typically and characteristically dangerous . . . and the law reasonably may presume that such an article is always dangerous[.]" *McLaughlin v. United States*, 476 U.S. 16, 17 (1986); *see also Brooks v. State*, 314 Md. 585, 591 (1989) ("[A] real gun [is] objectively dangerous."). A handgun is an inherently dangerous weapon and nothing in *Bruen* changed that fact.[12]

---

[12] Because firearms are themselves dangerous, the presence of a firearm is an aggravating factor in countless crimes. For example, Maryland's criminal assault statute imposes more than double the criminal penalty if the assault involved a firearm. CR § 3-202. Similarly, using a firearm in the commission of a robbery adds five to twenty years to the otherwise applicable robbery sentence. CR §§ 3-402, 3-403, 4-204.

And Maryland is not alone. Our sister states and the federal government routinely impose more severe sentences, sometimes just because a crime involves mere possession of a gun. *See, e.g.*, *United States v. Jackson*, 276 F.3d 1231, 1234 (11th Cir. 2001) ("[W]e have held that, in certain circumstances, mere possession of a firearm can be enough to apply a sentencing enhancement."); Tex. Penal Code § 22.02; Tex. Penal Code § 22.01 (guns as an aggravating factor for assault). Almost universally, using a gun in the commission of a crime is punished more severely because of the gun's inherent danger.

The majority disagrees, citing *State v. Stone*, 493 Md. 78 (2026). In my view, however, *Stone* requires only that the police officer must be able to point to objective, reasonable, articulable facts indicating that criminal activity is afoot. 493 Md. at 123. *Stone* requires courts to balance "the need to search (or seize) against the invasion which the search (or seizure) entails," and to evaluate an officer's observations in light of the "whole picture." *Id.* at 99, 101 (quoting *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968); *United States v. Cortez*, 449 U.S. 411, 418 (1981)). The question in *Stone* was whether an officer's observation of the defendant manipulating a cell phone while driving constituted reasonable suspicion for an investigatory stop. *Id.* at 85. The controlling statutes governing mobile phone use while driving prohibit certain activities, such as texting, but also "permit legal uses of a mobile phone while driving, such as turning the phone on and off, using GPS, and contacting 9-1-1 or other emergency services." *Id.* at 118-19. The statutes, therefore, render the conduct observed—touching a mobile phone while driving—equally consistent with lawful and unlawful behavior. Accordingly, the Court held that "[w]here a police officer observes a driver manipulating, touching, or pressing the screen of a phone, without additional information, a reasonable and prudent officer would not be justified in believing that the person may have violated traffic laws governing use of a mobile phone while driving." *Id.* at 119. The observation, therefore, did not justify a stop. *Id.* at 119, 124. The conduct in *Stone* was ambiguous; the statute required more.

This case is different. In *Stone*, the mobile phone was not an inherently dangerous weapon, nor was the vehicle that the defendant was driving. Additional facts were required before one could reasonably conclude that the defendant's manipulation of the cell phone

12

violated the applicable transportation laws and transformed the vehicle he was driving into a traffic hazard. Here, the "whole picture" includes additional elements which justified the stop of Hicks. Hicks reacted to the unmarked police car, separating from a group of people and blading to conceal his gun. Hicks was holding his hand in close proximity to the gun when officers approached him. Significantly, the facts in this case start with the presence of a gun, already an inherently dangerous weapon, as opposed to a cell phone, which is not. Thus, as previously mentioned, the possession of a dangerous weapon such as a gun diminishes the quantum of plus factors required.[13]

**Conclusion**

The thoughtful and thorough opinions of the majority and the concurring judges reflect painstaking work on this important case. Our work has been more difficult because the case came to us with an underdeveloped record and little airing of the legal issues below.[14] As our *in banc* opinions show, Hicks now raises significant issues that may

---

[13] After October 2023, a person whose handgun is visible to ordinary observation is engaged in conduct that is unlawful under PS § 5-307. Visible, noncompliant carry is now in a category of its own within the reasonable suspicion framework—not merely a factor, but a dispositive, objective predicate for a *Terry* stop. The *Stone* Court recognized there are circumstances when a single factor can provide reasonable suspicion. The Court distinguished its earlier decision in *In re D.D.*, 479 Md. 206 (2022), in which it held that the odor of marijuana, by itself, was sufficient to justify an investigatory detention. The Court explained, "[o]ur holding in *D.D.* and discussion of the reasonable suspicion standard was tied to the unique situation posed by the odor of marijuana. We stated that 'a particular circumstance or set of circumstances may satisfy the reasonable suspicion standard but fall short of probable cause.'" *Stone*, 493 Md. at 129-30 (quoting *D.D.*, 479 Md. at 231).

[14] Before the suppression court, the defense waited until closing before raising its argument that, following the Supreme Court's decision in *Bruen*, the observation, by law enforcement, of a person openly carrying a handgun no longer provides reasonable

13

depend on authorities and facts that were not apparently relevant when the suppression hearing began. As a result, this is not a good case in which to establish whether, at the intersection of the Fourth and Second Amendments, carrying a gun can justify a *Terry* stop. This case would have to be decided differently if Hicks had been stopped any time after October 2023. An officer considering an identical situation today *would* have reasonable suspicion of unlawful activity if the officer sees more than a "momentary and inadvertent exposure" of "a handgun" or of "the imprint or outline of a handgun." PS § 5-307.

One thing is certain: police must be allowed to enforce laws enacted by the General Assembly to ensure that only law-abiding citizens walk our streets with guns.

---

suspicion to support a *Terry* stop. The argument clearly raises an issue of first impression that would alter Maryland decisional law and practices that courts and police have followed since *Terry v. Ohio,* 392 U.S. 1, 20-21 (1968). But the motion to suppress did not mention the *Bruen* case, and counsel essentially waived opening arguments. Consequently, it was not unreasonable for the State and its witness, Officer Ramsey, to focus on the visibility of the gun imprint over the other circumstances that supported the officers' reasonable suspicion to conduct a *Terry* stop.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 634

September Term, 2024

_____

IN BANC

_____

STEVEN HICKS

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Graeff,
Berger,
Nazarian,
Arthur,
Leahy,
Reed,
Friedman,
Shaw,
Zic,
Ripken,
Tang,
Albright,
Kehoe, S.,
               JJ.

_____

Concurring Opinion by Friedman, J.

_____

Filed: June 4, 2026

Some will welcome today's holding as a constraint on *Terry* stops. I do not think it will function that way. The original *Terry* opinion demonstrated great concern about the scope of the authority it was conferring on police officers in the field. Writing for the Court, Chief Justice Warren described a stop-and-frisk as "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment," and insisted it was "not to be undertaken lightly." *Terry v. Ohio*, 392 U.S. 1, 17 (1968). That caution has not survived contact with the real world. Scholars have documented how *Terry*'s factor list has expanded over time, and how its cumulative operation falls with particular force on communities of color. *See, e.g.*, Renée McDonald Hutchins, *Stop* Terry: *Reasonable Suspicion, Race, and a Proposal to Limit* Terry *Stops*, 16 N.Y.U. J. LEGIS. & PUB. POL'Y 883 (2013); Jeffrey Fagan & Amanda Geller, *Following the Script: Narratives of Suspicion in* Terry *Stops in Street Policing*, 82 U. CHI. L. REV. 51 (2015).

[1] But if the remedy is to limit certain factors in the *Terry* analysis, the majority has identified the wrong one.

Professor Hochman Bloom has described a "whack-a-mole" dynamic in *Terry* doctrine: when a factor is identified as problematic, its use recedes, only to be replaced by

---

[1] Although this Court makes its own appraisal of the constitutionality of the stop-and-frisk, we defer to the suppression court's first-level factfinding. *See Grant v. State*, 449 Md. 1, 14-15 (2016). At the suppression hearing, the judge observed the police officers directly via the body-worn camera footage admitted into evidence and made no finding that the stop reflected discriminatory or racially motivated policing. Trial judges routinely evaluate police-citizen encounters and are institutionally well-positioned to detect coercive or impermissible motives. In the absence of any such finding—and with no evidentiary basis in this record to support one—I would not superimpose a discriminatory-motive narrative the factfinder did not adopt.

another. *See* Aliza Hochman Bloom, *Whack-a-Mole Reasonable Suspicion*, 112 CAL. L. REV. 1129, 1154 (2024) (discussing "blading" as an example of this dynamic). Eliminating concealed gun possession as a sufficient basis for a stop and frisk will not constrain *Terry*. It will redirect it. Police officers will not stop making stops. They will turn instead to the factors that remain—nervousness, associations, presence in a high-crime area, prior arrest history. Those factors are less verifiable, more susceptible to bias, and harder to contest. Shifting weight to these amorphous factors would only deepen the racialized patterns of enforcement that scholars have long documented.

Professor Hochman Bloom argues that treating gun possession as a special category both distorts the *Terry* inquiry and entrenches its racialized consequences—particularly in communities where lawful handgun carrying is rare or presumed absent. *See* Aliza Hochman Bloom, *The Emerging Firearms Hypocrisy of* Terry: *The Fifth Circuit in* United States v. Wilson, 78 STAN. L. REV. ONLINE 137 (2025) (criticizing the reasoning of *United States v. Wilson*, upon which the majority principally relies). Other scholars have raised similar concerns about the way handgun possession has come to distort the reasonable-suspicion inquiry and to concentrate *Terry*'s burdens in communities of color. I share those concerns. But I believe that eliminating handgun possession as a sufficient basis for a stop and frisk in the *Terry* analysis would exacerbate, not alleviate, the problems she identifies. Gun possession is objective and observable. It does not depend on a police officer's characterization of a neighborhood, an inference from body language, or a judgment about who belongs where. If *Terry*'s factor list is to be pruned, we should turn the shears elsewhere—toward the factors that are vague, malleable, and prone to

2

discriminatory application, not toward the one factor that is concrete, specific, and directly tied to the frisk authority *Terry* was designed to justify.

I recognize the tension between an expansive reading of *Bruen* and the continued application of *Terry* in circumstances like these. That tension is real, and I do not minimize it. But it is not ours to resolve. If the Supreme Court concludes that *Bruen*'s implications require a recalibration of *Terry* doctrine in the context of licensed handgun carrying, it is free to say so. Until it does, I would apply the law as it stands.

My colleague, Judge Nazarian, predicts a different future, and I respect that prediction. I am pleased that these concerns are, for the first time, joined in the pages of the Maryland Appellate Reports. Which prediction proves correct is, in the first instance, in the hands of the police. But ultimately, the line is ours to hold.